# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 97-1800

———————

Sylvia Ware,

        Appellee,

v.

Jackson County, Missouri,

        Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  Western District of Missouri
\*
\*
\*

———————

Submitted:   November 17, 1997

Filed:   July 27, 1998

———————

Before RICHARD S. ARNOLD, Chief Judge,[1] and McMILLIAN and WOLLMAN,
Circuit Judges.

———————

McMILLIAN, Circuit Judge.

———————

[1]The Honorable Pasco M. Bowman succeeded the Honorable Richard S. Arnold as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 17, 1998.

Jackson County, Missouri (the County), appeals from a final order entered in the United States District Court[2] for the Western District of Missouri in favor of inmate Sylvia Ware (Ware), following a jury verdict of $50,000 on her 42 U.S.C. § 1983 claim.[3] Ware v. Jackson County, No. 95-0477-CV-W-BD (W.D. Mo. Feb. 19, 1997) (hereinafter "slip op."). For reversal, the County argues that the evidence was insufficient as a matter of law to establish (1) a continuing, widespread, persistent pattern of unconstitutional conduct by county employees; (2) deliberate indifference by the County to a substantial risk of harm to Ware; and (3) a causal link between the County's conduct and Ware's injury. In addition, the County contends that the district court erred in omitting the words "continuing," "widespread," and "persistent" from the jury instruction on "pattern of unconstitutional conduct" and in instructing the jury that the Director of the Jackson County Department of Corrections (JCDC or "the jail") is a final policymaker for the County. For the reasons discussed below, we affirm the order of the district court.

## Jurisdiction

The district court had subject matter jurisdiction over this civil rights action under 28 U.S.C. § 1343. Jurisdiction on appeal is proper based upon 28 U.S.C. § 1291, and the notice of appeal was timely filed under Rule 4(a) of the Federal Rules of Appellate Procedure.

---

[2]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri.

[3]In addition, the district court granted Ware's motion for attorneys' fees. The County does not contest this ruling as a separate issue on appeal. Nor does the County challenge the district court's denial of its motion for a new trial.

**Facts**

This case arises out of the rampant sexual misconduct of employees at the JCDC toward female inmates. Ware was an inmate at the JCDC in August 1993. At all relevant times, Megerman served as the director of the JCDC. In 1995 Ware brought a § 1983 action against the County, alleging that JCDC Corrections Officer (CO) John Toomer raped her in violation of the Eighth Amendment while she was a JCDC inmate. A jury returned a verdict of $50,000 in favor of Ware and against the County on May 10, 1996. The following underlying facts are stated in the light most favorable to the verdict and are largely derived from the order of the district court denying the County's post-trial motion for judgment as a matter of law or, in the alternative, for a new trial. See slip op. at 4-6, 10-15, 18-20.

CO Toomer's Sexual Misconduct and the County's Response

CO Toomer began working at the JCDC on or about March 20, 1993. Less than one month later, inmate Jacqueline Dela Cruz alleged that Toomer ordered another inmate, Mary Hylton, to expose her genitalia to him. According to Dela Cruz, on at least two separate occasions, she overheard CO Toomer tell Hylton, who occupied a cell across from Dela Cruz, that Hylton would have to raise her nightshirt and pull down her pants in order to obtain a candy bar. In addition, CO Toomer would frequently open Hylton's cell, make obscene sexual gestures to Hylton, and talk to Hylton about oral sex. On one occasion, CO Toomer allowed a male inmate to look in on Dela Cruz while she used the toilet. Dela Cruz also observed CO Toomer and three male trustees having sex with female inmates in the showers.

At trial, Hylton corroborated Dela Cruz's allegations and testified to other incidents in which CO Toomer performed oral sex on her and had her perform oral sex on him, allowed a male inmate to observe her use the toilet, asked her for her telephone number and address, engaged in sexual intercourse with her, and threatened her not to

tell anyone about these incidents. At all relevant times, Hylton was in remedial classes and was described as "mentally slow."

Dela Cruz and Hylton reported some of these incidents to CO Keisling, who then relayed their complaints to the Manager of Detention, James McCoy, in a memorandum dated April 9, 1993. Joint Appendix (J.A.) at 1107. CO Keisling wrote the following postscript in the memorandum: "I do think there might be something to this." Id. Also on April 9, 1993, Pat Byler, the GED teacher at the jail, sent a memorandum to Jon Barth, Administrative Assistant to the Manager of Detention, advising him of Dela Cruz's allegations. Id. After receiving Byler's memorandum of April 9, 1993, Barth conducted an investigation of CO Toomer. He spoke to inmates Dela Cruz and Hylton and had CO Toomer take a polygraph test. On May 11, 1993, based on his investigation, Barth recommended to the Director of the JCDC, Charles Megerman, that CO Toomer be terminated. Barth was concerned about what CO Toomer would do to prisoners and believed that CO Toomer could not be trusted. Barth wrote: "This investigation has shown that CO Toomer has not been truthful with us. Something did occur between CO Toomer and inmate Hylton. . . . Therefore the Department has no alternative but termination of this employee." Id. at 1111.

Despite Barth's recommendation, no disciplinary action was taken against CO Toomer. Instead, Megerman sent CO Toomer a memorandum stating that he (Megerman) expected exemplary behavior of him. Furthermore, McCoy, Barth, and Terri O'Neill, one of CO Toomer's direct supervisors, all testified that no one asked or directed them to keep a close watch on CO Toomer following Megerman's decision

not to terminate him.[4] CO Toomer remained stationed on the same floor where Hylton and other female inmates were housed.

On July 22, 1993, Byler sent McCoy a second memorandum regarding CO Toomer's misconduct, this time stating that Hylton had reported that she and CO Toomer were having sexual intercourse and oral sex and that she consented to such activity. Several days later, Byler received a memorandum from Jon Morefield, "investigative specialist" for the JCDC, in response to Byler's second memorandum. Morefield's memorandum stated in pertinent part: "Concerning remarks made to you by inmate Hylton on 07-21-93, the allegations have been investigated and the case is now closed." Id. at 1109. According to the County, Morefield mistakenly assumed that Byler's memorandum pertained to Hylton's first set of allegations and failed to recognize that these were, in fact, new allegations. Morefield's memorandum to Byler was the only document generated from Byler's second memorandum. Neither McCoy, Morefield, nor anyone else at the jail interviewed Byler about what Hylton had told him. Morefield later testified that he never conducted an investigation of these allegations. Megerman testified that knew of the second set of allegations and expected the incident to be investigated. However, he did not follow up with any of his subordinates to verify that an investigation took place; nor did he talk to CO Toomer about the allegations.

On the night of August 29, 1993, Ware reported to Terri O'Neill, the acting Corrections Supervisor (CS), that she had been raped in her cell by CO Toomer. Upon

---

[4]Megerman testified that he and McCoy discussed the need to pay closer attention to CO Toomer, but no one was assigned this task or made aware of this concern. Shift Administrator (SA) Jackie Robinson testified that his usual practice in such circumstances would be to tell CO Toomer's immediate supervisor, Randy Howard, to pay closer attention to CO Toomer. Joint Appendix at 703-08. However, the County offered no proof that SA Robinson had such a discussion with Howard or that any increased supervision was in fact prescribed for CO Toomer.

receiving Ware's complaint, CS O'Neill reported the incident to her supervisor, Norman Dennison, who was the acting Shift Administrator (SA). SA Dennison responded immediately to CS O'Neill's report and went to speak to Ware directly. Pursuant to JCDC policy, Ware's cell was sealed, and the Jackson County Sheriff's Department was called and advised of Ware's allegation. Ware was then taken to the JCDC medical clinic and later transported to Truman Medical Center where vaginal swabs were taken from her. A forensic chemist for the Regional Crime Lab tested the swabs and detected the presence of seminal fluid. At trial, the jury found that CO Toomer had raped Ware on the night of August 29, 1993.

Other Officers' Sexual Misconduct and the County's Response

Inmate Jean Stone testified that she was sexually assaulted by JCDC guards on several occasions. The assaults began soon after her arrest and arrival at the medical housing unit of the JCDC in or around March 1990. While being transported in the infirmary, CO Johnson touched her breast. Later, she had sexual intercourse with CO Johnson and, on a separate occasion, she had oral sex with CO Michael Williams. On May 18, 1990, CO Williams came into her cell in the medical housing unit and had sexual intercourse with her, and then let an inmate, Donald Noble, into the cell to have sex with her. CO Williams then reentered the cell after Noble and had sex with Stone again. Stone reported the May 18 incident to a nursing student and also spoke to several other JCDC personnel about it. Soon thereafter, Stone was taken to Truman Medical Center. Stone's medical examination indicated the presence of hairs and seminal fluid that were racially consistent with those of inmate Noble and CO Williams.[5] Also, Noble's cup was later found in Stone's cell. Both inmates Stone and Noble were in locked cells to which only the JCDC guards had keys. CO Williams was suspended pending the outcome of the County's investigation of the May 18

[5]The fluid and hair samples suggested that the perpetrators were black. Both inmate Noble and CO Williams are black.

incident. The County later determined that CO Williams had not had sexual contact with inmate Stone, and thus, no disciplinary action was taken against him. Nor was any disciplinary action taken against CO Johnson.

Similar allegations were made by inmate Shalana Jackson in 1989 against CO Jeffrey Burgett. Jackson alleged that Burgett had sexual intercourse with her. During the investigation of this incident, CO Burgett gave conflicting statements about what happened and was not forthcoming with information. A polygraph test of CO Burgett revealed that he had not truthfully answered questions pertaining to his sexual conduct toward Jackson. As a result, a three-day suspension was recommended. However, CO Burgett was never disciplined for this incident. Instead, Megerman sent him a memorandum stating in pertinent part: "You assured us that this will never happen again, and I once more choose to believe you." Id. at 372. Also, a note was placed in CO Burgett's personnel file that Megerman and Robinson would watch him closely. There is no evidence that any additional supervision took place.

On November 1, 1989, Captain Pierce forcibly stripsearched a resistant female inmate. Megerman concluded that, because there were no exigent circumstances precipitating the search, the inmate should have been searched by a female guard pursuant to JCDC policy. After an investigation of this incident, Megerman told Pierce: "Knowing you as well as I do, I feel this won't happen again." Id. at 385. Megerman also recommended that Pierce, who had served at the JCDC for twenty years, be permitted to retire in lieu of being fired over this "serious" incident.

Some time prior to August 1993, CO Tyronne Bomar stood outside a library door while another officer, Stanley Brooks, had sex with a female inmate. During an interview with his shift manager, CO Bomar stated that other officers had engaged in similar sexual misconduct. An investigation revealed that CO Brooks had, in fact, had inappropriate sexual contact with an inmate. CO Brooks was subsequently terminated. The investigation further revealed that CO Bomar did not report the incident as required

by JCDC policies and procedures. CO Bomar remained stationed at the jail but was suspended for failing to report the incident more quickly.

In 1988 a disciplinary officer investigated CO Al Hooten's relationship with inmate Christie White and concluded that CO Hooten had had sex with White. In 1989 it was reported that CO Hooten gave White fifty dollars to perform a sex act. The investigator concluded that White was more involved with CO Hooten than she admitted. In July 1990 McCoy advised Megerman that he (McCoy) had written a letter to Hooten informing Hooten of their concerns and reprimanding Hooten for going to the seventh floor to "check on" White. Barth later reviewed the file on Hooten and concluded that no other action had been taken against him. Subsequently, another guard reported seeing CO Hooten kissing a female inmate in a closed office. CO Hooten was never disciplined.

Another investigation determined that CO Robert Klimt had performed pat-down searches of females inmates in violation of JCDC policy. Captain Barth witnessed this misconduct and failed to report it. The investigator of this incident recommended that Barth be suspended for one day. However, neither CO Klimt nor Barth were disciplined; Megerman merely told CO Klimt that he should slow down because pat down searches are unacceptable and he should "know better."

In August 1989 the Support Services Supervisor at the JCDC, Abayomi Owoyemi, was accused of putting his hand down the front of a female inmate's pants. According to the County, an investigation of this incident revealed no evidence to support the allegation, so no disciplinary action was taken.

Barth testified that he could not recall any instance where there had been increased supervision of an officer accused or suspected of sexual misconduct. Barth also testified that he could not recall any instance in which a guard was assigned to a different floor following a complaint. Finally, Barth testified that he could think of no

-8-

incident in which the report of an inmate was treated as substantial evidence of officer misconduct. Likewise, McCoy testified that he was unaware of any incident in which the word of an inmate was credited over that of a guard.

JCDC Policy Statements and Hierarchy of Authority

The JCDC is a department created by Executive Order of the County Executive, and is subject to his or her control. The chain of command for JCDC staff begins with the Corrections Officer (e.g., CO Toomer), who is supervised by the Corrections Supervisor (e.g., Terri O'Neill), who reports to the Shift Administrator (e.g., Jackie Robinson), who reports to the Manager of Detention (e.g., James McCoy), who is supervised by the Department Director (in this case, Charles Megerman), who is, in turn, supervised by the Manager of Administration, and ultimately by the Jackson County Executive.[6] Both the Manager of Administration and the County Executive have the right to overrule any decision made by the Department Director and the authority to request that an employee be subject to additional supervision. Megerman's personnel decisions are reviewable by the Jackson County Merit System Commission and are subject to the Jackson County Merit System Commission Ordinance. Id. at 1148.

At all relevant times, the JCDC Policy Statement setting forth general rules of conduct, major rule violations, and disciplinary sanctions was issued by the authority of Megerman. The JCDC Policy and Procedures Manual expressly provides that the JCDC is accountable to County officials, and that the internal policies are subject to review and change by the County Executive. The Policy Statement provides in part:

---

[6]William Waris and Marsha Murphy held the position of County Executive from 1988-1990 and 1990-1993, respectively.

-9-

When an employee violates a rule of conduct, the supervisor of that employee must address the infraction. This includes bringing the rule infraction to the attention of the employee with a discussion of how that rule was actually violated. The supervisor must also determine whether or not to recommend a disciplinary sanction against the employee. *Administrative and management level staff will review disciplinary sanctions and decide on the final review of that sanction.*

. . . .

All discipline is administered with the understanding that the Director may choose alternative sanctions not mentioned in the suggested range as listed in this policy. This includes reducing or increasing the sanction imposed.

Id. at 1112, 1121 (emphasis added).

The Policy Statement also expressly prohibits sexual contact between inmates and staff; indeed, "becoming involved socially and/or romantically with inmates or ex-inmates who have been in custody within the last five years, or their families," carries a sanction of suspension or termination. Id. at 1117.

As Department Director, Megerman was responsible for the daily operation of the jail and for establishing and revising written policies. Megerman testified that he "assumes responsibility for whatever happens in jail." Id. at 478. None of the documents produced by the County indicates that the County Legislature, County Executive, Manager of Administration, or any other agency played a role in disciplining any JCDC employees or setting any of the policies that were introduced into evidence. Rather, all the policy statements produced by the County refer to Megerman as the "authority" responsible for promulgating the document. Moreover, none of the relevant documents in the record concerning the investigations of sexual misconduct referred

-10-

to in this case or the resulting disciplinary actions was sent or refers to any other county agency or department.

Barth testified that Megerman had the authority to reassign officers, including CO Toomer, to different locations or to require that they have additional supervision. McCoy testified that the final decision as to CO Toomer's discipline rested with Megerman. By the same token, however, Megerman testified that, in the past, he has been ordered by his supervisors to reinstate or promote particular employees. He further testified that he has been overruled on policy decisions and ordered to change performance evaluations. Also, in 1990 the Manager of Administration instructed Megerman that he could not send memoranda to anyone without first having such memoranda reviewed and approved.

## Discussion

A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law." Monell v. Department of Soc. Serv., 436 U.S. 658, 691 (1978) (Monell) (internal quotation omitted); see also McGautha v. Jackson County, 36 F.3d 53, 55-57 (8th Cir. 1994) (McGautha); Jane Doe A v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir. 1990) (Jane Doe A). "Official policy involves 'a deliberate choice to follow a course of action *** made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish governmental policy." Jane Doe A, 901 F.2d at 645. Alternatively, "custom or usage" is demonstrated by:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct;  and

3) Th[e] plaintiff[']s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

Id. at 646 (citing Harris v. City of Pagedale, 821 F.2d 499, 504-07 (8th Cir. 1987) (Harris)).

At trial, Ware argued that the County had a custom of deliberate indifference to sexual misconduct by JCDC staff, which caused her injury in violation of § 1983.  The County argues that the district court erred in denying its motion for judgment as a matter of law because the evidence at trial was insufficient to establish a § 1983  claim. Whether there is sufficient evidence to support a jury verdict is a legal question which we review de novo using the same standards as the district court.  "The law places a high standard on overturning a jury verdict."  Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997) (Hathaway).  Indeed, to prevail on appeal, the County has the difficult task of demonstrating that the evidence "points one way and is 'susceptible of no reasonable inference sustaining the position of'" Ware when viewed in the light most favorable to the verdict.  Keenan v. Computer Assoc. Int'l, Inc., 13 F.3d 1266, 1269 (8th Cir. 1994) (quoting White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)).  "Judgment as a matter of law is proper '[o]nly when there is a complete absence of probative facts to support the conclusion reached' so that no reasonable juror could have found for the nonmoving party."  Hathaway, 132 F.3d at 1220 (internal quotations omitted).

The County also challenges the district court's instruction to the jury on municipal liability[7] on the ground that Megerman was not a final policymaker such that

---

[7]See infra note 9.

liability can be imputed to the County from his conduct. We address each of these arguments in turn.

Continuing, widespread, persistent pattern of unconstitutional conduct

The County contends that the evidence at trial was insufficient to prove that a continuing, widespread, and persistent pattern of unconstitutional conduct existed at the JCDC. First, the County asserts that Ware introduced only a "handful" of prior complaints of sexual misconduct. According to the County, this "handful" is probatively insignificant because approximately 8,000 inmates are processed through the JCDC annually. In addition, the County contends that a meaningful portion of the complaints involves consensual or constitutional conduct that violates internal JCDC policies but has no constitutional implications, citing Freitas v. Ault, 109 F.3d 1335, 1339 (8th Cir. 1997) (Freitas) (holding that welcome and consensual sexual contact between inmates and prison personnel does not violate the Eighth Amendment), and Timm v. Gunter, 917 F.2d 1093, 1102 (8th Cir. 1990) (Timm) (holding that "minimal intrusions on an inmate's privacy," such as the surveillance of a showering inmate, may be outweighed by penological and safety concerns).

Third, the County contends that Ware failed to support most of the complaints of sexual misconduct with competent evidence, and that the complaints that were supported with competent evidence (e.g., the Stone and Hylton complaints) were promptly and thoroughly investigated. Although the County concedes that Hylton's second set of allegations was not investigated, it argues that its failure to investigate in this instance constitutes negligence, at most, and thus is not actionable under § 1983. Fourth, the County contends that even if there were a pattern of indifference toward the sexual misconduct of JCDC staff, the pattern was not continuing. Specifically, the County notes that there is a gap of three years between the complaints of sexual misconduct involving CO Toomer in 1993 and those involving other officers in or around 1988-1989. Finally, the County relies on JCDC policies expressly forbidding

sexual contact between staff and inmates as evidence that it does not condone, facilitate, or approve of any sexual contact between inmates and JCDC staff much less the sexual abuse of inmates by JCDC staff.

We leave open the question of whether, in determining that there was a pattern of unconstitutional conduct at the JCDC, the district court relied on conduct that this court has specifically held not to be unconstitutional in Freitas and Timm.[8]  Instead, viewing the remaining evidence in the light most favorable to the jury verdict, we hold that the jury verdict is supported by substantial evidence of a continuing, widespread, and persistent pattern of unconstitutional conduct.

The jury was entitled to infer that a pattern of unconstitutional conduct existed from the evidence of CO Toomer's sexual misconduct, which spanned five months and involved extortion, deception, and repeated sexual acts with an inmate of limited mental capacity, culminating in the rape of Ware.  The pattern is also evidenced by the Stone, White, and Jackson incidents.  That there was a gap of three years between CO Toomer's misconduct and that of other officers does not amount to a series of isolated incidents so far apart in time that CO Toomer's misconduct may be considered a single act upon which custom or usage cannot be based.  Cf. McGautha, 36 F.3d at 57 ("Liability for an unconstitutional custom or usage . . . cannot arise from a single act.").

---

[8]Some of the evidence of sexual misconduct introduced at trial involved an officer dating an ex-inmate, a male officer patting down a female inmate, a male officer spending time alone with a female inmate in closed quarters, male officers assisting in the strip search of a violent female inmate, male trustees viewing female shower areas, and allegedly consensual sex between inmates and prison personnel.  While these acts violate JCDC policy, they arguably are not of constitutional magnitude.  See Newman v. Holmes, 122 F.3d 650, 653 (8th Cir. 1997) ("[V]iolation of an internal prison regulation does not by itself give rise to an Eighth Amendment claim.") (citing Falls v. Nesbitt, 966 F.2d 375, 379-80 (8th Cir. 1992) (rejecting argument that a prison official's violation of an internal regulation is tantamount to a violation of the Eighth Amendment)).

Nor does the number of mishandled complaints compared to the number of inmates undermine our conclusion where the record is replete with evidence of repeated sexual misconduct on the part of JCDC personnel. Moreover, the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced. Cf. City of St. Louis v. Praprotnik, 485 U.S. 112, 131 (1988) ("Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced."). Finally, we reject the County's contention that the proof of CO Toomer's misconduct and other incidents was incompetent. The County failed to substantiate this argument in its briefs or at oral argument and failed to assert that it objected to the admission of such evidence.

In light of the foregoing, we hold that the evidence of record was sufficient to reveal a pattern of sexual misconduct by county personnel that is anathema to "'the evolving standards of decency that mark the progress of a maturing society,'" Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion)), and, thus, is in violation of the Eighth Amendment.

As a related issue, the County challenges the district court's failure to include the words "continuing," "widespread," and "persistent" in its instruction to the jury

regarding the "pattern of unconstitutional conduct."[9]  The County asserts that this omission substantially affected its rights.

In Parrish v. Luckie, we affirmed a similar instruction under the same challenge of incompleteness on the ground that the "proffered language [i.e., 'persistent,' 'widespread,' and 'continuing'] merely lays out the common characteristics of the word 'pattern' and is, therefore, surplusage."  963 F.2d 201, 206 (8th Cir. 1992) (Parrish) (rejecting same argument).  Accordingly, we find no error in the district court's omission of such language in the instant case.

Deliberate indifference to a substantial risk of harm

The County contends that there is insufficient evidence to establish that it was deliberately indifferent to a substantial risk of harm to Ware.  Rather, the County

---

[9]Jury Instruction No. 13 reads as follows:

Your verdict must be for plaintiff  and against defendant Jackson County, Missouri[,] if all the following elements have been proved by the preponderance of the evidence:

First, there was a pattern of unconstitutional misconduct by John Toomer or other jail guards, and

Second, Charles Megerman knew of these incidents of unconstitutional misconduct, and

Third, Charles Megerman was deliberately indifferent or tacitly authorized the unconstitutional misconduct; and

Fourth, as a direct result, the plaintiff was injured.

Joint Appendix at 1028.

asserts, it is its custom and policy to investigate promptly and thoroughly a complaint of sexual assault and to enforce its internal policies prohibiting sexual misconduct toward inmates.

In Farmer v. Brennan, 511 U.S. 825, 837 (1994) (Farmer), the Supreme Court elucidated the concept of "deliberate indifference" under the Eighth Amendment. The Court held that an official is "deliberately indifferent" in violation of the Eighth Amendment if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." Id. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842. Moreover, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his [or her] knowledge of a substantial risk of serious harm." Id. The Court further explained:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to find that the defendant-official had actual knowledge of the risk.

Id. at 842-43 (internal quotations omitted).

Eighth Circuit caselaw predating the Farmer opinion substantiates this view. See Harris, 821 F.2d at 506 (finding deliberate indifference where city officials were notified on "repeated occasions" of employee misconduct but "repeatedly failed to take

-17-

any remedial action"). More recently, we have applied this concept and found evidence of deliberate indifference in a variety of contexts and from varying degrees of proof. See, e.g., Sanchez v. Taggart, 1998 WL 257364, at *2 (8th Cir. May 22, 1998) (holding that evidence and inferences that official knew of inmate's restrictive medical condition, that inmate had confirmed physical limitations, and that official failed to inquire further are sufficient to survive summary judgment on finding of deliberate indifference); Newman v. Holmes, 122 F.3d 650, 652 (8th Cir. 1997) (upholding jury's finding that officer was deliberately indifferent to a known risk of harm in opening a dangerous inmate's cell door without a guard escort); Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996) (holding that Chief of Police's awareness of two complaints of misconduct against an officer and Chief's statement that he "wouldn't doubt" that officer committed an offense were sufficient to prove Chief was deliberately indifferent to victim's rights).

In our view, the County's deliberate indifference is evidenced by its failure to discipline adequately CO Toomer and other officers who engaged in sexual misconduct when there was ample evidence that female inmates were placed at a substantial risk of serious harm. Further, there is sufficient evidence that the County had notice because Megerman, a final policymaker, see infra, knew of CO Toomer's and other officers' sexual misconduct.

Megerman knew of allegations that CO Toomer demanded that inmate Hylton expose herself to him on two separate occasions, allowed a male inmate to look in on inmates Hylton and Dela Cruz while they were using the toilet, propositioned inmate Hylton for oral sex, and made sexual gestures to her with his tongue. Megerman also knew that CO Toomer's polygraph test regarding these allegations indicated deception and, more important, that Barth, who conducted the investigation of these allegations, found the evidence against CO Toomer credible enough to recommend that CO Toomer be terminated. Finally, Megerman knew that a second set of allegations of sexual misconduct were made against CO Toomer that was never investigated.

-18-

As for Megerman's subjective awareness of an obvious risk of harm, Megerman testified that he believed that an officer's past misconduct can be an indicator of future misconduct and could indicate that prisoners were at risk. J.A. at 632-33. Megerman also testified that he was concerned that CO Toomer remained on duty at the jail, and that it would be appropriate to supervise him more closely. Id. at 486. Moreover, Megerman knew of and expressly disregarded Barth's recommendation that CO Toomer be terminated. Hence, this case is easily distinguishable from situations in which the defendant had a reasonable and genuine disbelief that a constitutional wrong would not occur. Compare Jane Doe A, 901 F.2d at 646-47 (holding that officials' knowledge of school district bus driver's questionable sexual conduct toward adults did not prove deliberate indifference to the rights of the handicapped children he later abused). Moreover, Farmer expressly forbids the inference that Megerman could not have known that CO Toomer presented an obvious, substantial risk of serious harm to Ware because there was no evidence of prior offenses toward Ware by CO Toomer: "[A] prison official [may not] escape liability . . . by showing that, while he [or she] was aware of an obvious, substantial risk to inmate safety, he [or she] did not know that the complainant was especially likely to be assaulted by the specific [individual] who eventually committed the assault." 511 U.S. at 843.

Indeed, despite Megerman's actual knowledge of CO Toomer's history of sexual misconduct involving female inmates, Megerman did not discipline CO Toomer or order any precautionary measures to protect female inmates from being further victimized by him. CS Randy Howard, CO Toomer's immediate supervisor, and CO O'Neill, the acting CS on the date of the initial misconduct, were informed of the first set of allegations against CO Toomer. However, there is no evidence that they were instructed to increase their supervision of CO Toomer. Moreover, Megerman failed to follow up with or inform CO Toomer's supervising officers of the second set of sexual misconduct allegations against CO Toomer. The foregoing facts, by themselves, support the jury's finding of deliberate indifference on the part of the County. Moreover, there is additional evidence of sexual misconduct among JCDC personnel

toward inmates, such as the Stone, White, and Jackson incidents, which evince an ongoing disregard of a pattern of sexual misconduct at the JCDC.

The County cites several instances in which complaints of sexual misconduct by JCDC employees were promptly and thoroughly investigated and the culpable employees were sanctioned. However, this evidence is not quantitatively sufficient to counter the proven instances of wilful disregard for which the jury found the County liable. Moreover, as stated above, neither the County's written policies prohibiting unconstitutional misconduct nor evidence of its employee training can insulate it from § 1983 liability where there is evidence of a pattern of misconduct.

Finally, the law permits officials charged with the knowledge of an obvious risk to prove that they were unaware of the risk or that "they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. The County has not met either burden; accordingly, we hold that there is sufficient evidence, as a matter of law, to support the jury's finding that the County was deliberately indifferent to an obvious, substantial risk of serious harm in violation of the Eighth Amendment.

Causal link between unlawful conduct and Ware's injury

In addition to establishing that the County was deliberately indifferent, Ware was required to establish causation; that is, Ware had to prove that the County's custom of laxness or inaction toward allegations of sexual misconduct was the "moving force" behind her injury. Board of County Comm'rs v. Brown, 117 S. Ct. 1382, 1388 (1997) (Brown) ("The plaintiff must . . . demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."); Monell, 436 U.S. at 694 (holding that official policy must be "the moving force of the constitutional violation" in order to establish the liability of a government body under § 1983); Tilson v. Forrest City Police Dep't., 28 F.3d 802, 807 (8th Cir. 1994) (Tilson) ("[A]

-20-

government custom of laxness or inaction must be the moving force behind the constitutional violation."). The County contends that the evidence is insufficient to support such a finding. The County argues that its failure to discharge or discipline CO Toomer as Barth recommended in May 1993 was not the "moving force" behind Ware's injury because the County's "inaction" was not "highly likely to inflict the particular injury suffered by [Ware]." Brown, 117 S. Ct. at 1392. The County also maintains that the connection between Megerman's knowledge and the specific constitutional violation is tenuous. Furthermore, the County reminds this court that "[w]here a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high." Id. at 1390.

Recognizing this danger and after careful review, we conclude that the evidence is sufficient to support the jury's finding that the County's failure to discipline CO Toomer (and other officers) was the moving force behind Ware's injury. In Harris v. City of Pagedale, we held that, where it becomes clear that an employee or group of employees needs close and continuing supervision and "the municipality fails to provide such supervision, the inevitable result is a continuation of the misconduct." 821 F.2d 499, 508 (8th Cir. 1987) (internal quotation omitted). The evidence in the instant case clearly demonstrated the need for close and continuing supervision of JCDC guards. The number of reported acts of sexual misconduct committed by CO Toomer alone, before he raped Ware, was sufficient to compel increased supervision or other, more stringent disciplinary action. Megerman declined, however, to exercise his authority to discipline CO Toomer, subject him to closer supervision, reassign him to a floor that did not house female inmates, or implement other precautionary measures. It is axiomatic that unpunished crimes tend to breed more criminal behavior. Thus, we hold that the evidence is sufficient to show that Megerman's failure to address sexual misconduct by JCDC personnel was the moving force behind the violation of Ware's constitutional rights. Accordingly, the evidence was sufficient, as a matter of law, to support the jury finding that the "inevitable result" of Megerman's

-21-

failure to address meaningfully CO Toomer's record of sexual assault, extortion, and deception was the continuation of that sexual misconduct, including the rape of Ware.

Final policymaker for the County

It is well-settled that the doctrine of respondeat superior does not apply under § 1983, Monell, 436 U.S. at 691, and that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (Pembaur). "[T]he authority to make municipal policy is necessarily the authority to make final policy." Praprotnik, 485 U.S. at 127. As noted above, a plaintiff can establish municipal liability by proving injury from the execution of an "official policy" or from actions that are so pervasive that they become "custom or usage" with the force of law. "This [latter] standard serves to prevent municipal evasion of liability through improper delegation of policy responsibility or acquiescence in pervasive constitutional violations by county employees." McGautha, 36 F.3d at 56-57 (citing Praprotnik, 485 U.S. 126-27).

In the instant case, Megerman promulgated written policy, had the ability to impose and modify disciplinary actions, and was responsible for the operation of the jail and the implementation of the policies that he put in force. From these facts, the district court determined that Megerman is a final policymaker for purposes of § 1983 liability. Slip op. at 18-23. Whether Megerman is a final policymaker is a question of law. See Pembaur, 475 U.S. at 483; see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) (Jett) ("Reviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law', the trial judge must identify those officials . . .who speak with final policymaking authority . . . concerning the action alleged to have caused the particular constitutional . . . violation at issue."). Accordingly, we review the district court's determination de novo.

-22-

When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departure from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

Praprotnik, 485 U.S. at 127 (emphasis in original). Stated differently, where the right to review a decision is retained, there has been an incomplete delegation of authority, and municipal liability may not attach; on the other hand, an absolute delegation of authority may implicate the municipality. Williams v. Butler, 863 F.2d 1398, 1402 (8th Cir. 1988) (noting "fine line" between delegating final policymaking authority and entrusting discretionary authority to official). Thus, the key question before this court is whether the County delegated to Megerman its power to establish final employment policy with respect to the discipline of officers. If so, then "[Megerman]'s decisions would represent county policy and could give rise to municipal liability." Pembaur, 475 U.S. at 483 n.12. Upon careful review of the record and the parties' arguments on appeal, we affirm the district court's holding.

The County argues that, because Megerman's decisions were subject to review and at times were reviewed by both the County Executive and the Director of Administration, he is not a final policymaker. The County asserts that Megerman merely possessed discretionary authority that was constrained by policies of the County. As evidence of Megerman's limited authority, the County cites the following examples: In 1990 the Manager of Administration reviewed every memorandum written by Megerman before he was allowed to distribute it. The County Mission Statement provides that the JCDC "will be accountable for its operation to County officials." J.A. at 922. Likewise, JCDC "Personnel Policies"state that the "Personnel Department, County Executive's Office, and the County Merit System Commission conducts, reviews, and initiates change on an as needed basis." Id. at 1148. It further states that

[t]he Department's personnel policies are governed by the practices and policies of Jackson County, Missouri. . . .  It is understood that the personnel policies . . . are subject to the provisions of the Jackson County Merit System ordinance.  If any of the provisions . . . conflict with the Merit System Rules, the provisions of the Jackson County Merit System shall prevail.

Id. at 924.

The County also relies on this court's holding in McGautha for support.  In McGautha, we upheld a jury instruction that Jackson County policy-making officials were the Jackson County Legislature and the Jackson County Executive for purposes of establishing municipal liability for injury arising from an official policy.  36 F.3d at 55-56.  We further opined that supervisory employees in the county collections department were not final policymakers for this purpose because "[t]hey merely exercised their discretion in carrying out officially pronounced county policy[;] . . . [t]heir actions were reviewable by the county executive and the county's Merit System Commission, and were also subject to written county policy."  Id. at 56.  In addition, we expressly recognized the distinction in proving municipal liability through "official policy" or "custom or usage" and its bearing on determining who is a final policymaker.  Id. at 57 ("The jury could have found a discriminatory custom sufficient to impose liability by considering the actions of the individuals that the court properly removed from the policy making ambit.").  In our separate analysis on "custom or usage," we affirmed the district court on the ground that a single act cannot create liability for unconstitutional custom or usage.  We reaffirmed, however, the principle that conduct of non-policymaking municipal employees can be imputed to the county where the county's policymaking officials are deliberately indifferent to or tacitly authorize such conduct after receiving notice thereof.  See id. at 55, 57 (citing Jane Doe A, 901 F.2d at 646).

-24-

In the instant case, we hold that the district court correctly identified Megerman as a final policymaker on JCDC personnel matters on the following bases: Megerman's position as director of the JCDC which has approximately 262 employees; his authority to promulgate JCDC policy, which sets forth, among other things, the rules of conduct for JCDC personnel; his authority to implement such policy; his exclusive handling of the disciplinary actions in this case; and the absence of a proven mechanism through which the Jackson County Executive and the Merit System Committee can review his decisions not to discipline officers or fully investigate allegations of misconduct. See Harris, 821 F.2d at 507 (Chief of Police, among others, had final authority to exonerate police officers of disciplinary charges or not to bring any disciplinary charges against them at all and thus has final authority to establish a municipal custom of deliberate indifference to a known pattern of unconstitutional police misconduct); see also Angarita v. St. Louis County, 981 F.2d 1537 (8th Cir. 1992) (holding that police chief who was highest ranking police official in St. Louis County, responsible for the entire department, and responsible for drafting and approving many of the department's general orders had final policymaking authority in St. Louis County). We believe that this conclusion is further supported by the JCDC Policy Statement which reads in part: "[A]ll discipline is administered with the understanding that the Director may choose alternative sanctions not mentioned in the suggested range as listed in this policy." J.A. at 1121. Further, the Supreme Court has recognized that final policymaking authority need not be all encompassing. See Jett, 491 U.S. at 737 (noting that official must have final policymaking authority on the "particular issue" that allegedly caused the constitutional violation at issue). Thus, as a matter of law, the evidence supports a finding that Megerman is a final policymaker with respect to the customs of failing to discipline adequately officers engaged in sexual misconduct and failing to investigate allegations of such misconduct. Moreover, Megerman's status as a final decisionmaker regarding CO Toomer is especially apparent because CO Toomer was a probationary employee who could not seek formal review of adverse employment decisions.

Accordingly, we hold that Megerman was a final policymaker for purposes of determining § 1983 municipal liability with respect to the decisions at issue in the instant case and that the district court did not err in so instructing the jury.

## Conclusion

For the foregoing reasons, we affirm the order of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.