**Antonio WARD, Plaintiff,**

v.

**CITY OF DES MOINES, Defendant.**

**No. CIV. 4–00–CV–20413.**

United States District Court,
S.D. Iowa,
Central Division.

Feb. 1, 2002.

Roger J. Kuhle, John O. Haraldson, Danielle Foster-Smith. Kuhle Law Office PC, West Des Moines, IA, for plaintiff.

Mark Godwin, Scott J. Beattie, Des Moines City Atty., Des Moines, IA, for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BREMER, United States Magistrate Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment, (Clerk's No. 20), filed October 1, 2001. The parties consented to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c).

Plaintiff, Antonio Ward, brought suit against Defendant, City of Des Moines, pursuant to 42 U.S.C. § 1983, claiming the City violated his rights under the Fourth Amendment when a City police officer used excessive force against him.

The City moves for summary judgment on the basis that Ward has not made a

showing sufficient to establish the elements essential to his claims, that no genuine issue exists as to any material fact, and the City is entitled to judgment as a matter of law.

Ward filed his Resistance on November 9, 2001. The City filed a Reply on November 26, 2001. A hearing was held on December 20, 2001. This matter is fully submitted.

## I. STANDARD FOR SUMMARY JUDGMENT

A court shall grant a motion for summary judgment only if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Shrum v. Kluck*, 249 F.3d 773, 777 (8th Cir.2001). A court must consider the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

To preclude the entry of summary judgment, the nonmovant must make a showing sufficient to establish the existence of every element essential to his case, and on which he has the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shrum*, 249 F.3d at 777. When a motion is made and supported as required in Federal Rule of Civil Procedure 56(a), the adverse party may not rest upon the mere allegations or denials in his pleadings, but must set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. At the summary judgment stage, the court may not make determinations about the credibility of witnesses or the weight of the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. MATERIAL FACTS NOT IN DISPUTE

Unless otherwise indicated, the following facts are either undisputed or viewed in the light most favorable to Ward, the nonmoving party.

On July 29, 1998, at 12:45 p.m., officers of the Des Moines Police Department ("Department") conducted an investigation at 143 22nd Street, Des Moines. During the investigation, Chastity Smith told officers that her former boyfriend, Gilbert Simon, had used a cement block to break the windows in the car in which Smith and the couple's three minor children were sitting. The broken glass injured Smith and the couple's three-year-old son. Smith said Simon also pointed a shotgun at her.

As a result of the investigation, the officers requested an arrest warrant for Simon. A police investigative report was filed and broadcast to officers on duty. The report noted that Simon was wanted on several warrants, including a recent warrant for going armed with intent. (D.M. Police Supp. Report at 4.) Police considered him armed. The police report described Simon as a 36–year–old, 140–pound, black man, who was 5 feet 9 inches tall. The report stated that Simon was wearing blue jogging pants and a blue shirt.

At approximately 1:40 p.m., Plaintiff Ward was outside working on his property at 14th Place and University Avenue, Des Moines. The 30–year–old Ward was wearing clothing similar, but not identical, to Simon's clothing as described in the police report. Ward had been doing yard work, and yard equipment was lying near him.

Jeffrey Clemens, a City police officer who was driving his patrol car on University Avenue, saw Ward and believed he fit the suspect's description. Ward saw Clemens motion for someone to come towards him. Clemens was wearing sunglasses, and

Ward could not tell at whom Clemens was looking and motioning. Ward assumed that Clemens was motioning to three persons in the lot next to him; Ward continued working in the yard.

Clemens, however, was motioning to Ward to approach the police car. When Ward did not approach, Clemens left the car, walked to Ward, and asked why he did not come to the police car. Ward apologized to Clemens and asked, "What did I do?" (Pl.'s Statement Facts Res. Mot. Summ. J., at ¶ 8.) When Clemens asked to see his identification, Ward said, "I live in the blue house (referring to a property two lots away), but my name is Tony." *Id.* at ¶ 9. Ward told Clemens that his identification was in his house, and he offered to get it for the officer. Clemens told Ward to stay where he was, and the officer radioed the dispatcher with Ward's description and location.

Approximately two minutes later, Officer Pendleton arrived at the scene and told Clemens, "Oh, that's not the guy," referring to Ward. *Id.* at ¶ 10. At that point, Ward began walking away from the officers. Ward claims Clemens ran after him, grabbed him, and repeatedly slammed him against a house, injuring him.

When Ward asked Clemens, "What did I do?," Clemens said, "If you don't cooperate, we'll take you to jail." *Id.* at ¶ 12.

Officer Pendleton approached Clemens and repeated that Ward was not the suspect. Clemens released Ward. As Ward walked toward his house, he looked back and, he claims, saw that Clemens was laughing at him.

Later that day, Ward went to a hospital's emergency room, where he complained mainly of shoulder pain. Ward told the physician that a police officer had slammed him against a house, and had pulled and grasped his upper left arm. Ward said that following the incident, his head had ached all day. The physician noted discoloration and bruising on Ward's upper left arm, and that the back of his neck, back, and inner left arm were all tender to palpation. The physician gave Ward a prescription for an anti-inflammatory drug. He told Ward to go home, rest, take Tylenol pain medication, or the anti-inflammatory medicine for pain, use cold packs on the area of discomfort, and return to the emergency room if problems occurred. Ward asserts he suffered pain in his back, shoulder blade, neck, arm and head, and he had abrasions.

In his affidavit, Assistant Chief Morton stated that the Des Moines Police Department requires its officers, including Clemens, to attend a 20–week basic-training class, during which officers receive extensive training in the legal aspects of use of force, the laws of arrest and search and seizure, and the appropriate and legal techniques of arresting and detaining a person. (Morton Aff. at (Ex. C)).[1] Plain-

---

1. The training-course outline for 2001 (which the Court assumes contains the same policy followed in 1998) states in part as follows:

   D. In general, force used to make an arrest must be only that force required to take the defendant into custody. For example:

   1. Defendant attempts to run but stops when the officer grabs him. Grabbing the defendant is the only force required.

   .     .     .     .     .

   E. The force required to make an arrest must be discontinued once the resistance is stopped and the defendant restrained.

Def.'s Ex. C at 70–71.

tiff disputes only that the training was extensive. (Pl.'s Res. at ¶ 17.)

The parties agree that in addition to requiring the basic-training course, the police department required all officers, including Clemens, to attend annual three-day training programs, during which they get updated information on laws concerning arrest, detention, and search and seizure.

The parties further agree that the police department's use-of-force policy states an officer shall use only the amount of force necessary to make an arrest and maintain control of the arrestee.

The Department's 1996 written Standard Operating Procedure states as follows:

D.   Rights of the Accused

1.   When the police encounter a citizen, we must carefully observe the constitutional rights of all parties under the Constitutions of the United States and the State of Iowa.

.         .         .         .         .

10–4   COURTESY

A.   Public Courtesy

1.   The people in the police department encounter tens of thousands of citizens yearly.   Many of those citizens will be agitated, angry, injured or in a negative frame of mind.   Others will be perfectly normal.

2.   It is very important that police employees approach all persons with common courtesy.   A nasty, impolite or condescending attitude will generate or enhance such an attitude in others.

Def.'s Ex. D at 2–3.

The Department's 1994 personnel rules state in part, "USE OF FORCE: Officers shall not use more force than necessary in making an arrest or while maintaining custody of the individual arrested." (Def.'s Ex. D at 11.)

The Department was unaware of any other conduct complaints against Clemens.

## III.   ANALYSIS

Ward alleges that his injuries were caused by the City's deliberate indifference, in that the excessive force Officer Clemens used to seize Ward—after Officer Pendleton said Ward was not the suspect sought—is either the City's policy and custom or the result of the City's inadequate training of officers in the use of force.

### A.   Policy or Custom

██   A municipality cannot be liable for the actions of its police officers under a theory of respondeat superior.   *See Board of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (*Brown*) (stating municipality may not be held liable under § 1983 solely because it employs tortfeasor) (citing *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *Shrum,* 249 F.3d at 778 ("Respondeat superior or vicarious liability will not attach under § 1983.") (citation and emphasis omitted).   A municipality may, however, be liable for the unconstitutional acts of its officials or employees, when those acts implement an unconstitutional municipal policy or custom.   *Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir.1999); *Smith v. Watkins,* 159 F.3d 1137, 1138 (8th Cir. 1998).   To establish municipal liability, a plaintiff must prove that a municipal policy or custom was the moving force behind the constitutional violation; only deliberate action by a municipality can meet the "moving force" requirement.   *Mettler,* 165 F.3d at 1204 (citing *Brown,* 520 U.S. at 400, 117 S.Ct. 1382; *Monell,* 436 U.S. at 694, 98 S.Ct. 2018).   A policy is described as an "official policy, a deliberate choice of a guiding principle or procedure made by

the municipal official who has final authority regarding such matters." *Mettler,* 165 F.3d at 1205; *see Ware v. Jackson County, Mo.,* 150 F.3d 873, 880 (8th Cir.1998).

Ward argues that in 1998 the Department did not have, but should have had, a policy governing officers' interaction with persons who are neither material witnesses nor suspects. The record shows, however, that the Department's official policy included rules governing officers' interaction with the public. *See* Def.'s Ex. D at 2–3. The City contends, and Ward admits, that the Department's use-of-force policy states that an officer shall use only that force that is necessary to make an arrest and maintain control of the arrestee. Ward has not identified any official policy that arguably played a role in Clemens' alleged use of excessive force during the arrest.

■ The Court therefore must determine if Ward has produced evidence from which a jury could reasonably find the existence of a relevant municipal custom.

Ward must identify a pattern of widespread unconstitutional conduct so pervasive and well-settled among the municipality's employees that it had the effect of law. *Smith,* 159 F.3d at 1138 (citations omitted); *McGautha v. Jackson County, Mo. Collections Dep't,* 36 F.3d 53, 56 (8th Cir. 1994) (citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018 (1978)), *cert. denied,* 515 U.S. 1133, 115 S.Ct. 2561, 132 L.Ed.2d 814 (1995). This standard prevents a city from evading liability "through improper delegation of policy responsibility or acquiescence in pervasive constitutional violations by county employees." *Id.* at 56–57.

■ To prove a municipal custom exists, Ward must satisfy the following three requirements: (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to, or tacit authorization of,

such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, that is, proof that the custom was the moving force behind the constitutional violation. *Mettler,* 165 F.3d at 1204.

As support for his claim, Ward points to a July 31, 1998, newspaper article concerning the complaint he filed with the Department alleging that Clemens mistreated and injured him after mistaking him for a criminal. (Bates No. 00078.) The article states, "Each year, about 87 people file complaints against the Des Moines Police Department. Most of them are determined to be unfounded." *Id.* The article, however, does not indicate how many, if any, of the filed complaints alleged that officers used excessive force. Ward also cites a November 8, 2001, newspaper article stating that, "several claims of excessive force resulted in lawsuits" against the Department in the late 1990s, and that in approximately 1998, the Department "began a conscious effort ... to reduce the use of force." (Bates No. 00154.) The article shows that Des Moines police used force 387 times in 1997, 486 times in 1998, 306 times in 1999, 256 times in 2000, and 155 times through late October 2001. *Id.* The article does not indicate how many times police officers were alleged to have used excessive force, how many lawsuits contained excessive-force claims, how many plaintiffs alleging excessive force prevailed on their claims, or how many total arrests were studied during these periods.

The record contains evidence of only a single alleged excessive-force incident, which "normally does not suffice to prove the existence of a municipal custom." *Mettler,* 165 F.3d at 1205. Matthew Schmell, a Department police

officer who serves in the Office of Professional Standards, stated in his affidavit that he knows of no accepted custom or practice in the Department that would permit the use of force exceeding what the law allows. (Schmell Aff. at ¶ 7.) Even assuming the newspaper articles to be admissible evidence, the record contains insufficient evidence to demonstrate a "continuing, widespread, or persistent pattern of misconduct." *See id.* at 1205 (affirming grant of summary judgment for county; stating plaintiff offered no evidence that previous investigations similar to the incident in question were inadequate).

As previously mentioned, Ward may not rest upon the allegations contained in his pleadings; rather, Ward must respond with specific facts showing the existence of a genuine issue for trial. Fed.R.Civ.P. 56; *see Webb v. Lawrence County,* 144 F.3d 1131, 1134 (8th Cir.1998) (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548).

Viewing the facts in the light most favorable to Ward, no material questions of fact are in dispute, and the City is entitled to judgment as a matter of law.

## B. Inadequate Training

■ To trigger municipal liability on a claim of inadequate training, a plaintiff must establish deliberate indifference— that is, that municipal decisionmakers acted with conscious disregard for the consequences of their action. *Brown,* 520 U.S. at 407, 117 S.Ct. 1382. For example, if a training program does not prevent constitutional violations, municipal decisionmakers may be put on notice that a new program is needed. *Id.* Deliberate indifference may be inferred from the decisionmakers' continued adherence to a training program that they knew or should have known had failed to prevent employees' tortious conduct. *Id.* Similarly, a pattern of tortious conduct by inadequately trained employees may indicate that lack of proper training, rather than a one-time negligent administration of the training program, or factors peculiar to the officer involved in the incident, is the moving force behind the plaintiff's injury. *Id.* at 407–08, 117 S.Ct. 1382.

■ The City asserts, and Ward admits, that after the 20–week basic-training course, the City required Clemens and all officers to attend an annual three-day training program that provided updated information on laws concerning arrest, detention, and search and seizure. Ward has provided no evidence of defects in the City's training procedures. Ward has shown neither that decisionmakers continued to adhere to a training program they knew or should have known had failed to prevent officers' use of excessive force, nor that a pattern of tortious conduct by inadequately trained officers indicated lack of proper training. At most, Ward has shown a single violation of federal rights [2], which does not alone permit an inference of municipal culpability and causation; Ward has shown that only Clemens may have acted culpably, not the City. *See id.* at 406–07, 117 S.Ct. 1382.

■ Evidence of a single violation of federal rights, however, may trigger municipal liability when the evidence is accompanied by a showing that the municipality failed to train its employees to handle recurring situations presenting an obvious potential for such a violation. *Id.* at 408, 117 S.Ct. 1382. In a narrow range of

---

**2.** For purposes of analyzing the present Motion for Summary Judgment, the Court views the record in the light most favorable to Ward, and assumes, without deciding, that

Ward has provided sufficient evidence for a jury to find that Clemens used excessive force against Ward.

circumstances, a federal-rights violation may be a highly predictable consequence of a municipality's failure to equip police officers with tools to handle recurring situations. *Id.* at 409, 117 S.Ct. 1382. "The likelihood that the situation will reoccur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights" could justify a finding that the decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymaker's choice. *Id.* at 409–10, 117 S.Ct. 1382.

Here, Ward has not shown that the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference. Viewing the facts in the light most favorable to Ward, no material questions of fact are in dispute, and the City is entitled to judgment as a matter of law on this claim.

## IV. CONCLUSION

Plaintiff has not made a showing sufficient to raise a material question of fact concerning the elements essential to his claims. The Defendant's Motion for Summary Judgment (Clerk's No. 20) is **granted;** no genuine issues of material fact remain to be determined at trial, and the Defendant is entitled to judgment as a matter of law.

IT IS SO ORDERED.