# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2680

_____

Rita Lynn Baker,                              *
                                             *
      Plaintiff - Appellee,                *
                                             *  Appeal from the United States
     v.                                     *  District Court for the Northern
                                             *  District of Iowa.
John Morrell & Co.,                           *
                                             *
      Defendant - Appellant.               *

_____

Submitted: April 15, 2004
Filed:  September 3, 2004

_____

Before LOKEN, Chief Judge, BYE, Circuit Judge, and MAGNUSON, District Judge.[1]

_____

BYE, Circuit Judge.

Rita Lynn Baker sued her former employer John Morrell & Company alleging sexual harassment, hostile work environment, retaliation, disparate treatment, and constructive discharge, all in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e to 2000e-17.  A jury found in favor of Baker on her sexual harassment, hostile work environment and retaliation claims and found she had been constructively discharged.  The jury awarded $839,470 in compensatory damages,

_____

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota, sitting by designation.

$33,314 in back pay and $650,000 in punitive damages. The district court[2] awarded $174,927 in attorney's fees and costs, as well as $38,921 in front pay. Morrell now appeals the district court's 1) denial of its motion for judgment as a matter of law (JAML), 2) order awarding attorney's fees and costs, and 3) order granting Baker's motion to amend her complaint after the verdict to include a claim under the Iowa Civil Rights Act (ICRA). Iowa Code ch. 216. We affirm.

I

The facts, viewed in the light most favorable to the verdict, Keenan v. Computer Assocs. Int'l, 13 F.3d 1266, 1268 (8th Cir. 1994), reveal the following.

Baker began working at the Morrell meat packing plant in Sioux City, Iowa on October 2, 1984, as a Computer Scale Operator. She worked for the company until April 2001, when she took an extended medical leave. During her employment with Morrell, Baker worked on a production line with, among others, Jeff Eichmann, a/k/a "Eight-Ball."

At trial, several Morrell employees testified about problems they personally encountered or observed involving Eichmann. For example, co-worker, Kay Nilson, testified:

> A: [Eichmann] called me like a fat cow or an elephant . . . . I took him to the office, he'd say, I didn't do that. I said, Jeff, you're lying, and you know you're lying. And he would argue with me.

> ***

---

[2]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

Q: Did you ever learn he was disciplined?
A: No, I don't think he ever was disciplined because it didn't stop. It just continued, and if it wasn't me, it was one or two or six other people.
Q: Now the people that he was treating this way, were they primarily men or primarily women?
A: I saw a lot of it with the women. I saw a lot of it with the women. I know of two women, two other women besides Rita and myself, that took Jeff up to the office.

Nilson first complained about Eichmann to her foreman and then to Steve Joyce, Director of Human Resources, but Morrell never addressed the problem. Nilson testified sexually discriminatory comments and actions were commonplace in the Morrell lunch room and in front of management. Nilson also observed Eichmann treat Baker the same way.

Georgia Risley also worked at Morrell with Eichmann and he called her a "wine tit" and a "fucking scab bitch." Risley complained to her foreman, her union representative and to Human Resources, but nothing was done. Risley testified Eichmann harassed females in front of management and called a female manager a "Mexican low life fucking cunt." Joyce responded to Risley's complaints by saying she and Eichmann should quit acting like kids. Risley also testified she saw Eichmann rub up against Baker:

A: Eight-Ball was always trying to rub up against anybody and everybody, especially Rita . . . . It's where you - instead of taking and putting your backs together and walking past somebody, it's called put your front to her back and rub up.

\*\*\*

A: He would come in behind her, and he would go (demonstrating) to her. Whether he got close enough to touch her was not always the case, but he would do it.
Q: What you're saying is kind of a hip thrust into towards her behind?

A: Yes, sir.
Q: And his hands up in the air kind of squeezing together while he's doing that?
A: As in to pull into.
Q: As if he was grabbing her and pulling her into him.
A: Uh-huh.

Debra Canady, a former co-worker, left Morrell after ten years because of the sexual harassment she experienced. Canady described frequent lewd behavior toward women in the plant and in the lunch room. She complained to Joyce about the work environment but Morrell took no action. Canady also noticed Eichmann was allowed much longer breaks than Baker.

Co-worker Colleen Loza testified Eichmann would "throw boxes at [her] and call [her] a fucking bitch." She observed Eichmann singled out women for his harassment and talked frequently about "blow jobs." She also saw Eichmann throw boxes at Baker and heard him call her a "bitch, fucking bitch" all the time.

In July 1995, Eichmann began harassing Baker after a close friend of her's died. Eichmann worked downstream from Baker on the production line and harassed her that day, saying, "My friend died, boo-hoo," and made moaning and crying sounds. He also caused the production line to backup and stop. Baker testified she pushed the boxes off to the right of the scale downstream towards Eichmann and he shoved them back at her and made crying and moaning sounds. Baker asked her foreman Ron Ridge to make him stop, but Ridge did nothing so she asked to see Joyce. After Baker met with Joyce, things improved for a brief period.

During the summer of 1995, Baker developed medical problems and as a result frequently asked Ridge for a break to use the bathroom. When she did, Eichmann would mock her in front of Ridge saying "I gotta pee, I gotta pee, my friend died, boo-hoo." Baker testified: "I was having menstrual problems, and it was pretty

degrading standing there and listening to it and waiting to get to go the bathroom." Baker was often forced to wait 30-45 minutes to use the bathroom, while male co-workers, including Eichmann and Brian Murphy, did not have to wait. Eichmann's mocking occurred throughout 1996 and most of 1997 despite Baker's continued complaints to Ridge and Joyce. In August of 1996, Baker reported to Joyce that Ridge was not providing her with access to the bathroom and as a result she menstruated through her pants. Baker's co-worker, Gloria Windle, corroborated Baker's testimony and stated the bathroom problem with Ridge was never resolved.

In October 1996, Baker had a hysterectomy. Originally, Baker planned to pursue a non-surgical alternative, but after learning the process could take several months to a year she opted for surgery to avoid further mocking from Eichmann. Baker told Joyce why she had a hysterectomy. In February 1997, four months after her hysterectomy, Baker was released to go back to her work with directions from her doctor to use the bathroom frequently. Baker testified when she asked to use the bathroom Eichmann would say, "I gotta pee, I gotta pee," and Ridge sometimes crossed his legs as if he "were trying to hold it." Baker again complained to Joyce and things improved briefly. Baker's medical problems, however, had became common knowledge among her co-workers by then and the bathroom issue was never fully resolved. For example, in March 1997, Baker told Ridge she had to use the bathroom and Ridge got onto the conveyer belt in front of Eichmann and Baker and rode it with his legs crossed to Baker's scale. Ridge continued to deny Baker access to the bathroom until the beginning of 1998 when Ridge transferred to the maintenance department. Baker's new supervisor allowed Baker to use the bathroom when she asked.

In the summer of 1997, a co-worker suggested Baker hire Eichmann to fix her vehicle in an effort to improve their working relationship. Baker agreed and asked Eichmann to meet at her home. While at Baker's home, Eichmann played briefly with

the family cat.  Later, he told co-worker Brian Murphy and another employee he had been to Baker's home and "played with [her] pussy and it was black."

In July 1998, Baker's dog died and she took the day off.  The next day, Eichmann again mocked her, saying, "My dog died, I have to go home, I gotta pee." Baker complained to Joyce who said he would talk to Eichmann.  For a week or two following her complaint the harassment stopped.

In October 1998, Roy Baker, Rita's brother, saw Joyce at a store in Sioux City. Roy told Joyce there was a serious issue concerning his sister.  He explained what Eichmann and Ridge were doing and told Joyce he believed harassment and discrimination laws were being broken.  Nevertheless, throughout 1998, Eichmann continued to direct sexually suggestive and offensive remarks and actions at Baker. Eichmann repeatedly called her a "fucking idiot" or "dumb bitch."  On one occasion, Eichmann told two male co-workers Baker was at his house in his bedroom.  Another time, Baker told Eichmann to turn the line on and he told her "blow me bitch."  Baker testified when Eichmann "would say something or yell or make a comment and then he would take his hands and grind his groin area" while he was right beside her.

After Roy Baker's conversation with Joyce, Rita and Roy talked about her work situation.  Roy testified Baker said Eichmann continued to harass her but she was afraid to pursue the matter.  Roy also testified Baker experienced breathing difficulties and panic attacks as a result of her work situation.  "She would shake like – almost like a vibrator would be hooked to her because she would become so upset about what was happening there and nothing being done."

Baker testified that prior to February 1999, she asked her union representatives Warren Baker and Ron Haase a "dozen or more times" to contact Joyce to complain about Eichmann.  She was told they contacted Joyce but it did not seem to help. Baker complained to the union again in February 1999, because Eichmann was

mocking her saying, "I gotta pee, it's raining in my house, my dog died." No corrective action was taken. By the middle of 1999, Baker was becoming very shaken, "just almost broken, crying constantly."

In March 1999, Morrell hired Kathi Brown as the full-time management supervisor in Baker's work area. Thereafter, Eichmann stepped up the harassment by intentionally backing up meat at Baker's scales. Eichmann would shut the line off between his station and Baker's causing meat to back up at her scale and fall on the floor. Baker reported the problem to foreman Brown and to Joyce. In September 1999, Joyce met with Baker and Eichmann. Joyce told them they had a "hard-on for each other" and told them to get along. The comment made Baker "angry because he was well aware for a long time how things were going . . . . I no longer felt he cared or had any respect for what was going on."

During this same time, another co-worker, Brian Murphy, joined Eichmann in harassing Baker. After the September 1999 meeting between Baker, Eichmann and Joyce, Eichmann told Murphy that Baker had gone to personnel again and "ratted [Murphy] out." Baker was concerned because Murphy and Eichmann worked on either side of her and could make her job very difficult. Thereafter, Murphy began sending boxes sideways and backwards to make Baker's job more difficult. Co-worker Walt Busch told foreman Brown about the harassment several times but it did not stop.

In October 1999, Murphy, who had told Georgia Risley many times he wanted to "get in [Baker's] pants," asked Baker and co-worker Windle if he and his wife could go fishing with them. Baker and Windle accepted Murphy's request believing if they became friends with him the sexual harassment would stop. Murphy showed up without his wife but Baker fished with him anyway. After that, Murphy was nice to her for a short period of time.

Around the time of Baker's birthday (November 14, 1999), Murphy asked if he could buy her a birthday drink but she refused. The next day, multiple boxes were sent backwards from Murphy. On December 3, 1999, Eichmann threw a forty-pound box of meat at Baker. Also around the same time, Murphy gave Baker a "Wonder Woman" Pez candy dispenser. When she asked why, Murphy said because I always "wonder" what you look like naked. Baker complained to foreman Brown about the incident and was told Brown would talk with Murphy. Later in December, Murphy put a note on Baker's car asking for her telephone number. She refused and he again sent boxes the wrong way down the production line. Baker complained to Brown, management supervisor Russ Mitchell, and Joyce, and told them the problem started because she would not have a drink with Murphy or give him her telephone number.

Co-worker Busch testified that in late 1999, Murphy was spreading rumors about Baker saying Murphy had gone to Baker's house and she answered the door "with nothing on but a robe and [her] tits were hanging out . . . . [A]nd that she was good in the sack." Baker found out and confronted Murphy, who laughed but did not deny spreading the rumors. Because of the rumors, Baker told Brown she wanted to see Joyce but Brown told her Joyce did not want to see her and he was tired of Baker and Eichmann coming in and out of the personnel office.

Around December 9, 1999, Eichmann called Baker a "fucking bitch" and threw a box of meat at her. The box landed on her foot and Baker asked supervisor Mitchell to help her. Baker was crying and Eichmann told her "your fucking mother's dead." Baker asked Mitchell to confirm what he had seen and heard but Mitchell refused. Baker asked Mitchell to go with her to personnel to report Eichmann's harassment but Mitchell said no one was in personnel. Later that day, Baker reported the incident and harassment to her family doctor and took time off work until December 12, 1999. Baker's doctor noted she was having trouble with anxiety and depression due to the harassment and prescribed an anti-depressant.

On December 18, 1999, Eichmann got mad at Baker and pushed her twice. Later, in the parking lot, Eichmann and Murphy were laughing by Eichmann's truck as Baker walked to her car. Eichmann drove his truck at her and stopped just short of hitting her. He then backed up his vehicle and followed Baker to her car while laughing at her.

On December 29, 1999, Eichmann again threw boxes onto the conveyer causing the line to jam. When Baker attempted to fix the problem, Eichmann and Murphy mocked her, saying, "I can't do anything right, I can't do my job and going boo-hoo." Baker had a panic attack, became confused, and fled the plant. She drove to her brother's house and he took her to the doctor. Roy Baker testified his sister was a "shell of a person" and showed up at his house shaking and crying hysterically.

The testimony of co-worker Busch supported Baker's testimony as to what had been happening to her in the months leading up to December 29, 1999. Busch testified Eichmann put the boxes on backwards and sideways so Baker had to do extra work. He also testified Murphy put about half the boxes on backwards, forcing Baker to do extra work. Busch viewed the actions as intentional but was never interviewed as part of any investigation into Baker's complaints. Busch further testified he heard Eichmann and Murphy call Baker names "pretty much every day." Eichmann called her a "dumb fucking bitch, don't know how to do your fucking job." Busch testified Eichmann made similar comments five or six times a day and he could tell the harassment was affecting Baker. He observed Baker became depressed and was no longer the "happy-go-lucky" person she once had been. Busch also testified Eichmann harassed only women.

Co-worker Windle testified that ten to fifteen minutes after Baker left on December 29, a manager asked her if she had talked to Baker. Windle asked why and the manager said Baker walked off the line. When Windle asked if it was because of

Eichmann, the manager nodded her head. Eichmann told Joyce on January 19, 2000, that when Baker left on December 29, Brown asked, "What did you guys do to her?"

On December 30, 1999, the union told Baker that Morrell fired her for abandoning her job the previous day. Morrell sent a letter confirming her termination on January 5, 2000. On January 10, 2000, Baker drafted an Iowa Civil Rights Commission (ICRC) complaint detailing the sexual harassment. On January 12, 2000, Joyce, who was not yet aware of the ICRC complaint, interviewed Busch about what caused Baker to leave the plant. Busch told Joyce about the harassment he had observed, including offensive name calling, backwards and sideways boxes, and Baker's refusal to go out with Murphy. Joyce interviewed Baker on January 17, 2000, and Baker reminded him of his previous "hard-on" comment. Baker told him she did not go to him on December 29 because of his inability or unwillingness to help her previously. Baker stated she had problems with Eichmann and Murphy every day and she had reported those problems to union representatives, and to Brown and Mitchell. She also told Joyce about other women who called her about what Eichmann had done to them. Baker told Joyce her doctor was not going to release her to return to work for two more weeks. Finally, Baker told Joyce, "[f]or the record, I want it known that in the past two months, I made 15 complaints against Eight-Ball and Murphy." At trial, Joyce testified neither Baker or Busch told him anything that raised "red flags" about sexual harassment.

Joyce interviewed Windle on January 19, 2000. Windle stated Eichmann and Murphy had been harassing Baker for a long time, and described the mocking and name calling. She told Joyce that Murphy wanted to go out with Baker and when Baker refused Murphy harassed her. Windle testified Joyce did not seem surprised by what she told him.

On January 19, 2000, Joyce interviewed Eichmann about why Baker left the plant on December 29, and, among other things, Eichmann told Joyce he and Murphy "knew this was coming two or three months ago" and "if Rita kept it against the company Murphy was going to be quiet but if she brought it against them - then . . . ." Eichmann told Joyce, "[I]f you act like you want her she won't have anything to do with you. If you act like you're not interested, then she wants you." Eichmann claimed Baker's supervisor told him "dozens of times that [she] was tired of Baker's bitching, but I can't do nothing about it." Joyce never investigated whether the supervisor actually made the comment to Eichmann.

On January 25, 2000, Baker saw her doctor again and told him she had been offered her job back but was afraid to return. Her chest pain, shortness of breath, crying spells and sleeping were improved but she was still waking up every three or four hours and was very tired. The doctor told Baker to come back in two weeks and stay off work. He diagnosed her with depression and hypertension.

Morrell learned of Baker's ICRC complaint during the first week of February, 2000. Joyce and Brown went to the Sioux City Human Rights Commission for a meeting regarding the complaint. Joyce admitted at trial Morrell never performed an investigation into Baker's sexual harassment complaints, even after she filed her ICRC complaint. Joyce interviewed Brown on February 11, 2000, about why Baker left work on December 29, 1999. Brown told him "Rita kept saying that Jeff was out to get her, trying to get her upset. Jeff Eichmann was stopping the line. When he stops the line, she has to move a little faster, catch up on some boxes. This happens on a daily basis." Brown told Joyce she felt sorry for Eichmann and Murphy and tried to stay neutral. Brown also told Joyce that Baker would "always say they're doing it again, turning boxes by Brian or stopping the line by Eight-Ball." Baker told Brown it would only get worse if she went to personnel.

-11-

Eichmann was given a written reprimand on February 16, 2000. Joyce's notes indicate it was because Eichmann's treatment of a female employee was inappropriate. At trial, Joyce testified Eichmann's written reprimand was not for sexual harassment. Rather, the investigation was into why Baker walked off the job, not into the harassment which led to the ICRC complaint. Joyce further testified Morrell never disciplined Eichmann for sexual harassment.

In mid-February 2000, Baker was released by her doctor to go back to work. Joyce told Baker she was being brought back and given another chance because she had been a good employee for fifteen years. Murphy was still working upstream from Baker and on her first day back he intentionally turned boxes sideways and backwards. On February 23, 2000, Eichmann intentionally rubbed up against Baker's buttocks. Baker reported the incident to the union representative and asked for a meeting with Joyce. Co-worker Busch observed the incident and testified Eichmann "slid right behind [Baker] rubbing his cock on her butt, had his arms out like that with a big smile on his face."

On February 24, 2000, Baker again met with Joyce and told him,

[F]or months, Jeff Eichmann, he gets me so stressed out, I hate to come to work - calling me a dumb bitch or a fucking idiot . . . . [H]e'll [Eichmann] come back and say "do your fucking job", he's yelling and screaming at me. I just want him to leave me alone don't talk to me . . . . Yesterday, to be arrogant and cocky, he passed by me, touched my backside, and flippantly said "excuse me."

Baker told Joyce she felt retaliated against by Eichmann and Murphy and said Eichmann should be disciplined for grinding his groin into her. She also told Joyce that Eichmann and Murphy should be given a copy of the sexual harassment poster posted outside Joyce's office. Morrell never disciplined Eichmann for rubbing against Baker.

In March 2000, Baker's work locker was broken into and the notebook she used to document harassment was stolen. In the years she had worked at Morrell, she had never had her locker pried open or anything stolen.

On March 9, 2000, Baker began seeing a psychiatrist who diagnosed her with major depressive disorder with panic symptoms. The psychiatrist prescribed medication and referred Baker to a therapist to address her panic symptoms and depression. On May 9, 2000, Baker told her family doctor she was still being harassed at work and was thinking about leaving her job.

In the spring of 2000, Brown told Baker she should not have dragged Brown "into this mess" by filing the ICRC complaint. Thereafter, Baker had problems with Brown, and believed she was mad because the complaint made it appear Brown had done nothing when Baker complained. Brown told Baker, "I'm tired of you bitching and complaining all the time."

Eichmann's harassment continued after the February 24, 2000, meeting with Joyce, although it was not as severe and Eichmann stopped the name calling. On one occasion, however, after Eichmann threw a box that hit her hand, Baker told Brown she wanted to report the incident to personnel. Brown told Baker she could not go to personnel because Baker did not have anybody to take her place on the line. Baker found someone to take her place and went to Joyce. When Baker came back, Brown was angry and threatened to fire her. Thereafter, Brown shortened Baker's bathroom breaks from ten to fifteen minutes to five minutes and increased the amount of time Baker had to wait for bathroom breaks to a half-hour as compared to the fifteen minute wait previously required. Brown also added responsibilities to Baker's job. Baker complained about the perceived retaliation to Joyce and Production Manager Jay Albert but Brown's actions did not change.

Later, Brown told Baker, "[S]he was sick of my shit and tired of me complaining." Brown also said Joyce was tired of it and did not want to see her. Brown refused to allow her a second person to help with the meta tenderloin product which required a label and a lid to be put on the box behind the scale operator. Previously, Baker had been assigned a helper, but when she returned from a vacation she was no longer provided any help. In contrast, another scale operator, a male, got a helper and so did the night scale operator. When Baker complained, Brown told her to "shut the fuck up." Joyce looked into the problem but Baker was still not given any help. Brown also gave male employees breaks whenever they asked and allowed them additional privileges. Baker told Brown she felt discriminated against and Brown told her to "shut up and not worry about it, it wasn't [Baker's] business what they were doing." Baker told Joyce she believed Brown was retaliating against her, but he said it was not retaliation. Because of the continued harassment and retaliation, Baker filed an amended complaint with the ICRC on June 22, 2000, specifying events that had occurred since her January 10, 2000 complaint.

On June 12, 2000, Baker saw her doctor for continued anxiety, depression and stress reaction. She reported Eichmann was continuing his harassment and had placed diapers in her work area. The doctor noted Baker was physically and mentally exhausted, had a poor appetite and nausea with anxiety-related gastritis.

On December 20, 2000, Baker brought co-worker Canady with her to report additional harassment to Joyce because Baker did not believe Joyce was documenting everything she reported. Baker reported that on December 10, 2000, Murphy said: "I gotta go home, its raining in my basement." Murphy then did what Baker described as a "gross, sexual hip thrust." Baker also reported Murphy was talking loudly, and said, "[I]f I have to go to trial I'll do what O.J. did." Baker felt personally threatened and told Joyce "I want you to know that I've felt something was going to happen to me, I've been worried, I've felt all along that I may not be safe."

By April 4, 2001, Baker's treating psychiatrist had diagnosed her with major depressive disorder, single episode, and post traumatic stress disorder and panic disorder. Baker was hospitalized on April 4, 2001, because of an overdose. Baker's brother testified he went to her house and found her "lifeless" in bed. Baker was transferred to a psychiatric unit where her psychiatrist classified the event as a suicide attempt and restricted Baker from going back to work because the presenting factor in her condition was her work environment.

On July 30, 2001, Baker saw her family doctor for depression. Baker had not returned to work after her April hospitalization and reported feelings of hopelessness and helplessness. She also reported spastic bladder symptoms, which were diagnosed as stress related. Baker was hospitalized again on August 28, 2001, for suicidal thoughts.

Baker's plan had been to return to work at Morrell, but after her second hospitalization she found a different job. Baker formally ended her employment at Morrell on February 14, 2002. Joyce testified Morrell never performed a sexual harassment investigation or discrimination investigation into the complaints she made.

Baker brought suit against Morrell claiming sexual harassment, hostile work environment, retaliation, disparate treatment, and constructive discharge, all in violation of Title VII of the Civil Rights Act of 1964. Baker also included a claim for class action relief which was later voluntarily dismissed. The case proceeded to trial and the jury found for Baker on her sexual harassment, hostile work environment and retaliation claims, and found Baker had been constructively discharged. The jury awarded $839,470 in compensatory damages, $33,314 in back pay and $650,000 in punitive damages. The district court awarded $174,927 in attorneys fees and costs, as well as $38,921 in front pay.

-15-

Baker's complaint alleged only violations of Title VII and did not include claims premised on violations of the Iowa Civil Rights Act. Because Title VII caps total damages awarded (excluding back pay) at $300,000, see 42 U.S.C. § 1981a(b)(3), Baker stood to recover a relatively small portion of the damages awarded. Accordingly, Baker moved to amend her complaint to include an ICRA claim. The ICRA does not allow for punitive damages but also does not include a cap for compensatory damages. Baker argued she should be allowed to amend her complaint because the legal standards for claims under Title VII and the ICRA are identical and Morrell would not be prejudiced by the amendment as it had fully defended the Title VII claims. Initially, the district court denied the motion but upon reconsideration granted it and reallocated the damage award to maximize Baker's recovery. The district court allocated all of the compensatory damages to the ICRA claim ($839,470), reduced the punitive damages award to $300,000 and allocated the punitive damages to the Title VII claim.

On appeal, Morrell first argues the district court abused its discretion by refusing to grant its JAML motion. Morrell contends the evidence was insufficient to prove 1) an objectively hostile work environment, 2) constructive discharge, 3) Morrell's failure to remedy the alleged harassment, 4) Morrell's notice of any sex-based harassment, 5) Morrell retaliated against Baker for complaining about the harassment, and 6) any retaliation affected a material term or condition of Baker's employment. Morrell next argues the district court's award of front pay and attorneys fees was excessive. Specifically, Morrell contends Baker failed to mitigate her damages by finding replacement employment, and the hourly rates claimed by her attorneys were excessive. Morrell also contends the awards for compensatory and punitive damages were unsupported by the evidence and excessive as a matter of law. Finally, Morrell contends the district court erred by allowing Baker to amend her complaint for the sole purpose of maximizing her recovery.

Morrell first contends the evidence was insufficient as a matter of law to prove 1) an objectively hostile work environment, 2) constructive discharge, 3) Morrell's failure to remedy the alleged harassment, 4) Morrell's notice of any sex-based harassment, 5) Morrell retaliated against Baker for complaining about the harassment, and 6) the retaliation affected a material term or condition of Baker's employment. We disagree.

We review the district court's denial of a motion for judgment as a matter of law de novo using the same standards as the district court. Keenan, 13 F.3d at 1268. Our task is to determine "whether there is sufficient evidence to support the jury's verdict." Id. (internal citation and quotations omitted). In doing so, we view the "evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." Id.

A.      Hostile Work Environment

Title VII prohibits employment discrimination based on sex and covers a broad spectrum of disparate treatment. 42 U.S.C. § 2000e-2; Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). A plaintiff may prevail in a discrimination claim by showing the inappropriate conduct creates a "hostile work environment." See 29 C.F.R. § 1604.11(a)(3). Baker's hostile work environment claim required proof that 1) she is a member of a protected group, 2) she was subjected to unwelcome sexual harassment, 3) the harassment was based on sex, and 4) the harassment affected a term, condition or privilege of her employment. Duncan v. General Motors Corp., 300 F.3d 928, 933 (8th Cir. 2002). The fourth element involves both objective and subjective components. Id. at 934. The harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment" and the victim must subjectively believe her working conditions have been altered. Harris, 510 U.S.

at 21-22. "There is no bright line between sexual harassment and merely unpleasant conduct . . . ." Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997). Accordingly, we view the "totality of the circumstances" in determining whether there is a hostile work environment. Klein v. McGowen, 198 F.3d 705, 709 (8th Cir. 1999). The factors we look to include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job. Duncan, 300 F.3d at 934.

Conduct this court has found sufficient to establish a hostile work environment claim includes pervasive sexual innuendo and repetitive offensive touching. See, e.g., Eich v. Bd. of Regents, 350 F.3d 752, 755-56 (8th Cir. 2003) (finding conduct sufficiently severe when plaintiff was frequently touched in numerous suggestive ways and was subject to simulated sex acts); Beard v. Flying J., Inc., 266 F.3d 792, 797 (8th Cir. 2001) (affirming judgment for plaintiff based on another employee brushing, rubbing and flicking plaintiff's breasts and pointing to his crotch); Howard v. Burns Bros., 149 F.3d 835, 838 (8th Cir. 1998) (describing a co-employee constantly making sexual innuendos, brushing up against plaintiff and telling lewd jokes with gestures); Smith v. St. Louis Univ., 109 F.3d 1261, 1262-63 (8th Cir. 1997) (reversing summary judgment for the employer where plaintiff faced consistent ridicule and derogatory comments about women, even though they were not sexually explicit); Hathaway, 132 F.3d at 1217-18 (finding a jury reasonably ruled for plaintiff when she was subject to two instances of offensive touching, followed by constant snickering and guttural noises from two other employees).

Applying these standards, we have little difficulty concluding the evidence was sufficient to support the jury's verdict. The lengthy factual recitation included above chronicles years of blatant sexual harassment leaving no doubt Baker was subjected to conduct so severe and pervasive as to create an objectively hostile and abusive work environment. Moreover, as did the district court, we reject out of hand Morrell's attempts to minimize the harassment and its accompanying claim it was

-18-

unaware of the sexual nature of the harassment.  Accordingly, we find the evidence more than sufficient to support Baker's hostile work environment claim.

### B.    Constructive Discharge

Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit.  Klein, 198 F.3d at 709.  "[I]ntolerability of working conditions is judged by an objective standard, not the [employee's] subjective feelings."  Gartman v. Gencorp, Inc., 120 F.3d 127, 130 (8th Cir. 1997) (internal citation and quotations omitted).  First, the conditions created by the employer must be such that a reasonable person would find them intolerable.  Id.  Second, "the employer's actions must have been taken with the intention of forcing the employee to quit."  Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981).   We have held, however, "[w]hen an employer denies a conscious effort to force an employee to resign . . . the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions."  Hukkanen v. Int'l Union of Operating Eng'rs Hoist & Portable Local No. 101, 3 F.3d 281, 285 (8th Cir. 1993).  Finally, "to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly"; therefore, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged."  West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995).

Once again, we have little trouble concluding the evidence was sufficient to support the jury's finding of constructive discharge.  The constant barrage of harassment endured by Baker over a period of many years was objectively intolerable.  Moreover, Baker's numerous attempts to resolve the problems went largely ignored by supervisors and management personnel to whom she repeatedly turned for help.  In the end, Baker had little choice but to leave the position she had held for over fifteen years and seek employment elsewhere.

C.    Retaliation

To establish a case of retaliation, a plaintiff must show 1) she engaged in a protected activity, e.g., complained about sexual harassment, 2) the employer took adverse action against her, and 3) there is a causal connection between the two.  See, e.g., Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997).  Morrell attacks the second element arguing there was insufficient evidence to support the jury's finding that the retaliatory acts constituted an adverse employment action.  We disagree.

Although actions short of termination may constitute adverse employment action within the meaning of the statute, "not everything that makes an employee unhappy is an actionable adverse action."  Id.  "Changes in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case."  Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994).  Applying this standard, we have held a reasonable jury could conclude that negative references to potential employers constituted sufficient adverse action to state a retaliation claim.  See Smith, 109 F.3d at 1266.  Conversely, we have held the loss of status and prestige that accompanied the replacement of a supervisor's staff, when her salary and position remained the same, did not constitute a sufficient adverse employment action.  See Ledergerber v. Stangler, 122 F.3d 1142 (8th Cir. 1997).

Here, Baker presented evidence showing Brown became antagonistic towards her because the ICRA complaint reflected badly on Brown's job performance.  In response, Brown limited Baker's bathroom and other breaks, added to her job duties, refused to provide her necessary job assistance, repeatedly yelled at her for making mistakes, withheld privileges allowed to other employees, and attempted to dissuade her from making further complaints.  We are satisfied these retaliatory changes in working conditions constituted significant and material disadvantages sufficient to

-20-

support the retaliation claim. As for Morrell's additional claim that the changes were insufficient to support the claim of constructive discharge, we find it unnecessary to address the issue because we have already concluded the constructive discharge claim was adequately supported by other evidence in the record. Accordingly, we affirm the district court's denial of Morrell's motion for JAML.

### III

Next, we consider whether the district court properly allowed Baker to amend her complaint to include a claim under the ICRA.

Following the verdict, Baker moved to amend the complaint to include a claim under the ICRA thereby allowing her to allocate the entire compensatory damage award to the state claim and maximize the remaining damages by allocating $300,000 of the punitive damage award to the Title VII claim. By doing so, Baker could recover $1,172,785 instead of only $300,000. Baker argued the amendment was permissible under Rules 8, 10(b), 15(b) and 54(c) of the Federal Rules of Civil Procedure. The district court denied relief on all grounds. Later, however, the court reconsidered its earlier denial and granted the motion under Rules 15(b) and 54(c).[3] Morrell appeals, arguing the district court abused its discretion.

### A.     Rule 15(b)

We review the district court's decision to grant or deny a motion to amend for an abuse of discretion. <u>Grandson v. Univ. of Minn.</u>, 272 F.3d 568, 575 (8th Cir. 2001) (stating the standard of review). Under Rule 15(b), an issue not raised in the pleadings, but tried by express or implied consent of the parties, "shall be treated" as

---

[3]Baker has not cross-appealed the denial of the motion to amend under Rules 8 or 10(b).

having been raised in the pleadings. Fed. R. Civ. P. 15(b). Thus, "[s]uch amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment." Id.

Recently, in IES Industries, Inc. v. United States, 349 F.3d 574, 579 (8th Cir. 2003), we addressed the consent requirement of Rule 15(b). In IES Industries, a nuclear power plant owner brought suit against the Internal Revenue Service challenging its decision denying tax credits resulting from trades of American Depository Receipts. The apparent purpose of the trades was to incur capital losses which could be used to offset capital gains from previous years. Id. at 575. The IRS deemed the transactions shams and disallowed the tax credits. On appeal, this court reversed and remanded for, among other things, calculation of the tax credits. Id. After the case was remanded, the IRS moved to amend the complaint to assert an affirmative defense it had not previously pled. The district court granted the amendment and on appeal IES argued the district court abused it discretion because IES did not consent expressly or impliedly to try the issue of the affirmative defense in the earlier proceedings. Id. This court rejected IES's arguments holding its position with respect to the tax credits throughout the litigation was consistent with the affirmative defense asserted by the IRS, and therefore it had impliedly consented to trial of the issue. In other words, consent was implied because evidence relevant to the affirmative defense had been introduced earlier without objection. Id. (citing Modern Leasing, Inc. of Iowa v. Falcon Mfg. of Cal., Inc., 888 F.2d 59, 63 (8th Cir. 1989)).

We read IES Industries as holding a district court does not abuse its discretion by allowing a Rule 15(b) amendment if the amendment seeks to raise an issue not inconsistent with the position taken by the non-moving party earlier in the proceedings. Accordingly, the district court did not abuse its discretion in this instance by allowing Baker to amend the complaint to include an ICRA claim. The

-22-

parties agree the proof and legal standards applicable to the Title VII claims and an ICRA claim are the same. Quick v. Donaldson Co., 90 F.3d 1372 (8th Cir. 1996). Thus, the amendment Baker sought was in no way inconsistent with Morrell's position throughout the litigation. Further, in EIS Industries, we rejected the argument that "Rule 15(b)'s consent requirement is not met where evidence that is relevant to an issue purportedly tried by consent is also relevant to an issue already in the case." Id. at 579. Rather, "[i]t is axiomatic that evidence bearing on both claims and the defenses to those claims may well overlap in a given case." Id. Accordingly, though we may have decided the issue differently, we cannot conclude the district court abused its discretion in granting the Rule 15(b) amendment. Id. at 580-81(holding a district court does not abuse its discretion by granting a Rule 15(b) amendment even though an appellate panel may have decided the issue differently).

B.      Rule 54(c)

Alternatively, we also hold the district court did not abuse its discretion by concluding the amendment was permitted under Rule 54(c) of the Federal Rules of Civil Procedure.

Rule 54(c) provides, except in cases of judgment by default, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in its pleadings." Fed. R. Civ. P. 54(c); see also Schumann v. Levi, 728 F.2d 1141, 1143 (8th Cir. 1984) ("[A] trial court must grant the relief to which a prevailing party is entitled . . . even though the party has not demanded it."). Rule 54(c) is not, however, without limits and we will review a district court's decision to grant an amendment for an abuse of discretion. Mark Andy, Inc. v. Hartford Fire Ins. Co., 233 F.3d 1090, 1092 (8th Cir. 2000). Accordingly, "[a] party will not be given relief not specified in its complaint where the 'failure to ask for particular relief so prejudiced the opposing party that it would be unjust to grant such relief.'" Atlantic Purchasers, Inc. v. Aircraft Sales, Inc., 705

F.2d 712, 716 (4th Cir. 1983) (quoting United States v. Marin, 651 F.2d 24, 31 (1st Cir. 1981)).  For example, if the pleading failure denies the opposing party the "opportunity to make a 'realistic appraisal of the case, so that [their] settlement and litigation strategy [could be] based on knowledge and not speculation,'" the amendment may properly be denied.  Id. at 717 (quoting Fed. R. Civ. P. 26(b)(2), Advisory Committee Notes to 1970 amendments); see also Vidimos, Inc. v. Laser Lab Ltd., 99 F.3d 217, 222 (7th Cir. 1996) (recognizing "[i]f the complaint explicitly or implicitly disclaims certain legal characterizations of the claim" an amendment may be inappropriate).

Morrell contends it was prejudiced by Baker's failure to plead an ICRA claim because had it known damages would not be capped under Title VII it may have settled the claim instead of risking a verdict in excess of the cap.  Morrell, however, has failed to present any evidence to show its settlement strategy was affected by the Title VII cap.  Indeed, aside from Morrell's bare assertion, we have no reason to believe it would have been any more inclined to settle this claim irrespective of whether an ICRA claim was pleaded.  Furthermore, Morrell was well aware throughout the course of the litigation Baker was demanding an amount to settle the claim well in excess of the Title VII caps.  Surely, this fact alone put Morrell on notice Baker was seeking a verdict in excess of $300,000.  In light of the liberal policy in favor of Rule 54(c) amendments, and because it is undisputed Baker proved an ICRA claim, we will not permit Morrell's bare assertion of prejudice to thwart the amendment.  The district court's decision to grant the amendment is affirmed.[4]

---

[4]As previously noted, the district court allocated the entire award of compensatory damages to the ICRA claim and $300,000 of the punitive damage award to the Title VII claim.  In affirming the district court, we express no opinion regarding the propriety of awarding only punitive damages under Title VII without a corresponding compensatory award because Morrell did not raise the issue.

VI

As for Morrell's remaining claims of error, we find them without merit and affirm for the reasons given by the district court.  <u>See</u> 8th Cir. R. 47B.

V

For the reasons set forth herein, the judgment of the district court is affirmed in its entirety.

_____