BYE, Circuit Judge,
dissenting.
I.
“Judgment as a matter of law is appropriate only when all of the evidence points *821 one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party.” Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.Sd 991, 995 (8th Cir.2010) (internal quotation marks and citation omitted). Thus, our only task in reviewing a district court’s denial of a motion for judgment as a matter of law is “to determine whether there is sufficient evidence to support the jury’s verdict.” Baker v. John Morrell & Co., 382 F.3d 816, 828 (8th Cir.2004) (internal quotation marks and citation omitted). We “must not engage in a weighing or evaluation of the evidence.” Id. We must not consider questions of credibility. Id. This is the governing standard of review in this ease — a standard the majority undeniably has chosen to ignore by concluding the evidence presented at trial is insufficient to overcome the appellants’ qualified immunity defense. Because I decline to join the majority in substituting its judgment for that of the jury, I respectfully dissent.
I am compelled to begin by emphasizing what I believe are the crucial aspects of the procedural posture in this case. As the majority notes, the appellants first asserted the defense of qualified immunity at the summary judgment stage. The district court denied their motion, finding genuine issues of material fact existed. The appellants did not challenge the court’s decision through an interlocutory appeal. Rather, the case proceeded to trial where, after six days of evidence presentation, the jury found in favor of Luckert and against the appellants, who then moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The district court denied that motion as well, concluding the evidence presented at trial, when viewed in the light most favorable to the verdict, “fully support[ed] the jury’s finding of deliberate indifference to serious medical needs.” Order Den. Mot. J. as a Matter of Law, Nov. 10, 2010, at 4. It is the district court’s denial of their post-verdict motion which the appellants are now challenging on appeal. The United States Supreme Court has been clear on what the governing standard of review at this stage of the proceedings must be. As the Court recently explained, when “defendants continue to urge qualified immunity [in a post-verdict motion], the decisive question ... is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense.” Ortiz v. Jordan,—U.S.-, 131 S.Ct. 884, 889, 178 L.Ed.2d 703 (2011) (citing Fed.R.Civ.P. 50). In reviewing the appellants’ challenge, therefore, we are bound to consider only whether the evidence presented at trial is sufficient to overcome their defense of qualified immunity. Based on the record before us, I am convinced the evidence is not only sufficient, it is indeed, overwhelming.
II.
A. Julian.
Purporting to be conducting “[a]n objective review of the evidence that is deferential to the verdict[,]” ante at 818, the majority concludes no reasonable jury could have found Julian’s conduct was the equivalent of deliberate indifference. However, allow me to offer this verdict-deferential recitation of the evidence regarding Julian. Despite her knowledge as to Sampson having attempted to commit suicide two weeks prior and being mentally unstable based on her own personal observation, Julian downgraded Sampson’s suicide watch from twenty to thirty minutes. Policy 12.4, however, provides visual checks of inmates on suicide watch, such as Sampson, must be conducted at intervals no longer than twenty minutes. In fact, Policy 12.4 does not even allow visual observation of suicidal inmates at intervals longer than twenty *822 minutes. Yet, Julian not only downgraded, but also kept Sampson on thirty-minute suicide watches until the very instant he actually committed suicide. Policy 12.4 also required Julian to consult with a shift supervisor before downgrading an inmate’s suicide watch.[6] Julian failed to consult anyone. Policy 12.4 required Julian to observe and assess inmates on suicide watch on a daily basis. The record here clearly concludes Julian failed to personally observe Sampson for eight entire days.
In addition, the following is what else Julian failed to do. She failed to report DCJ staff did not administer Sampson his medications on at least one occasion and, more importantly, missed his suicide watches on a number of occasions. As the majority notes, albeit in a footnote, DCJ log sheets clearly showed Sampson had one missed suicide watch per day for the period between August 2 and August 4, and five missed suicide watches again on August 5 as well as again on August 6. Julian knew about these missed watches. She did absolutely nothing to correct them.
Julian also failed to adjust Sampson’s medications as instructed and directed by Dr. Shoaib. The record shows she continued to administer Cymbalta (an anti-depressant) and Klonopin (an anti-anxiety medication) to Sampson after Dr. Shoaib ordered her to discontinue these medications. At the same time, she did not reduce the dosage of Sampson’s anti-psychotic medication and did not administer Lunesta (a sleep aid) as directed by Dr. Shoaib. In addition, Julian never informed Dr. Shoaib about her failure to reduce Sampson’s prescribed medications — a fact deeply troublesome because of Dr. Shoaib’s testimony as to his assumption the medications and dosages had been changed as he directed when ordering further adjustments to Sampson’s prescriptions on August 10.
In finding Julian was deliberately indifferent to Sampson’s serious medical needs, the jury also had the following evidence to consider. Julian did not tell Dr. Shoaib Sampson had attempted to commit suicide as recently as two weeks prior. She did not communicate to Dr. Shoaib any of Sampson’s requests for solitary confinement, his increasingly frantic notes, or his refusal to eat. The following is the type of information Julian found too insignificant, or perhaps too irrelevant, to pass on to Sampson’s treating physician. On August 6, Sampson submitted a request for medical care, stating: “Need to be transferred to Norfolk Regional Center to Dr. Stephen Oneil [sic] or I will die in here. My head is killing me. These meds are making me sick and confused.” During that same day, Sampson announced he would stop eating. The next day, August 7, Sampson again requested a “safety cell or solitary confinement. NO TV. I wish to be alone.” He further wrote: “The T.V. makes me go crazy please move me for the last time, im gonna loose [sic] it, no T.V. please.” Later that day, Sampson submitted another medical request form, pleading: “Dr. Mohamed please put me in isolation with no TV by myself. The T.V. is making me go insane, put me in solitary confinement A.S.A.P. please. Need medication.... ” Julian did not communicate any of these pleas to Dr. Shoaib. She simply wrote a cryptic note to Sampson: “No cells like *823 that available. Sorry. We are full.” As a result, Sampson remained in the general population, per Julian’s directions, where on August 10 he hung himself from the air vent utilizing a bed sheet. See Coleman v. Parkman, 349 F.3d 534, 540 (8th Cir.2003) (stating the placement of a suicidal inmate in a cell with exposed bars and a bed sheet is an unreasonable response to the inmate’s serious medical needs, which violates the “common sense rule”).
Based on the record before us, it cannot be said the evidence presented at trial is insufficient to overcome Julian’s qualified immunity defense. While a different jury may have found Julian’s conduct did not rise to the level of deliberate indifference, I cannot say no reasonable jury could have found Julian’s actions and inactions showed she was deliberately indifferent to Sampson’s serious medical needs. See Ortiz, 131 S.Ct. at 889; Howard, 615 F.3d at 995 (stating that on appeal of a denial of a motion for judgment as a matter of law, “we must give great deference to the jury’s verdict” and should overturn only if the evidence presented at trial is “susceptible of no reasonable inference sustaining the [verdict]”) (internal quotation marks omitted). I would therefore affirm the district court’s denial of Julian’s motion for judgment as a matter of law..
B. Campbell.
“Supervisors, in addition to being liable for their own actions, are liable when their corrective inaction amounts to ‘deliberate indifference’ or to ‘tacit authorization’ of the violative practices.” Howard v. Adkison, 887 F.2d 134, 137 (8th Cir.1989). The majority concludes that while “the evidence does not paint an impressive picture of [Campbell’s] performance as DCJ director ... [his] acts and omissions do not rise to the level of constitutional deliberate indifference.” Ante at 819. Construed in the light most favorable to the jury verdict, however, the evidence presented at trial does indeed show otherwise.
The evidence convincingly shows Campbell knew Sampson had attempted to commit suicide just two weeks prior and recorded this attempt in the “passbook.” A grand jury investigating another inmate’s suicide in 2001, however, had determined the “passbook” was an inadequate way of communicating potential problems with inmates among DCJ staff. Moreover, a “passbook” was not what Policy 12.4 required of Campbell and his staff. Rather, Policy 12.4 required the completion of a “suicide level form” upon a determination an inmate is potentially suicidal — a form, which was to be placed in a “suicide notebook” and was to be updated on a daily basis.[7] Yet, the evidence shows that during Campbell’s eleven-year tenure as DCJ’s director, he never enforced, or even knew of, these Policy 12.4 requirements. In fact, as the evidence at trial clearly revealed, in November 2008 — over two years after Sampson’s suicide — Campbell still did not know what a “suicide notebook” was. As a result of Campbell’s failure to enforce these provisions of Policy 12.4, DCJ staff did not follow the proper procedures relating to suicide intervention. In addition, while Campbell knew Policy 12.4 authorizes only ten- and twenty-minute watches for suicidal inmates, he tacitly authorized his staff members to administer *824 thirty-minute watches, in direct violation of Policy 12.4. Campbell was also aware that between the years 2000 and 2006 twenty-one inmates had attempted suicide, three of whom were successful. Yet, he failed to make a single revision to DCJ’s suicide prevention policy because, in his own words, he was “just not ... able to get around to rewriting that one.” Not only was he unable “to get around to rewriting” Policy 12.4, he was also unable to explain during the trial how, if at all, his staff received training in suicide prevention.
The jury also learned as to one of the successful suicide attempts prior to Sampson being executed in the exact manner as was Sampson’s suicide — the inmate hung himself from his cell’s air vent with a bed sheet. Yet, Campbell took no corrective measures to ensure the safety of DCJ’s vent system. He knew the safety cell- — • the only cell designed to be suicide resistant — was unavailable from August 3 to August 10, the day on which Sampson committed suicide. Yet, he offered no substitutes for a suicide-resistant cell, effectively forcing Sampson to remain in a general population cell where he had access to both a bed sheet and an air vent. See Turney v. Waterbury, 375 F.3d 756, 761 (8th Cir.2004) (concluding prison official’s actions exhibited deliberate indifference because, among other facts, the official failed to investigate an earlier suicide attempt and placed the inmate “in a cell alone with a bed sheet and exposed ceiling bars”).
Based on this evidence, a reasonable jury could have concluded Campbell was deliberately indifferent to the needs of suicidal inmates, including the serious medical needs of Sampson. Accordingly, because the evidence presented at trial was sufficient to overcome Campbell’s qualified immunity defense, I would also affirm the district court’s denial of his motion for judgment as a matter of law. See Ortiz, 131 S.Ct. at 889; Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir.1997) (“Judgment as a matter of law is proper only when there is a complete absence of-probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party.”) (internal quotation marks and citation omitted).
C. Dodge County.
“A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an ‘action pursuant to official municipal policy’ or misconduct so pervasive among non-policymaking employees of the municipality ‘as to constitute a “custom or usage” with the force of law.’ ” Ware v. Jackson Cnty., Mo., 150 F.3d 873, 880 (8th Cir.1998) (quoting Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). “Custom or usage” may be shown by “[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity’s employees.” Ware, 150 F.3d at 880. The majority concludes Dodge County is entitled to judgment as a matter of law because the evidence presented at trial is insufficient to demonstrate the “ ‘continuing, widespread, persistent pattern of constitutional misconduct’ necessary to find the county liable.” Ante at 820 (quoting Jenkins v. Cnty. of Hennepin, Minn., 557 F.3d 628, 634 (8th Cir.2009)). Based on the evidence before it, however, the jury in this case was entitled to infer that a pattern of constitutional misconduct existed and was allowed to flourish ad infinitum.
Without question, Dodge County’s Corrections Policy & Procedure Manual does include a written Suicide Intervention Policy (Policy 12.4). The record shows, how *825 ever, that in a six-year span under this policy, there were three suicides and twenty-one suicide attempts. The record also clearly demonstrates neither the County nor its employees took any action to improve or revise the policy. On the contrary, despite the high number of suicide attempts and actual suicides, Policy 12.4 has not been revised since it was first implemented going all the way back to 1994. More importantly, certain provisions of Policy 12.4 were never followed or enforced. For instance, both Campbell and Julian admitted DCJ employees did not follow the three suicide levels identified in Policy 12.4 as: (1) Alert, which requires close observation and placement in a safety cell for inmates who have recently attempted to commit suicide, such as Sampson; (2) Warning, which requires visual checks no more than ten minutes apart, possible restriction of items in inmate’s cell, and possible isolation of inmates who display strong signs indicating suicide or who have a history of attempting suicide; and (3) Watch, which requires visual checks in intervals no longer than twenty minutes. Additionally, Campbell did not enforce, and DCJ employees did not follow, Policy 12.4’s directives for the completion a “suicide level form” for suicidal inmates, the maintenance of a “suicide notebook,” and the performance or recording of daily assessments for inmates placed on suicide watch. In fact, Campbell did not even know whether or how new employees receive training on Policy 12.4.
“[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.” Ware, 150 F.3d at 882. The evidence presented at trial unequivocally established that essential provisions of Policy 12.4, such as establishing the appropriate level of suicide watch and maintaining proper documentation for suicidal inmates, were neither followed by DCJ employees nor enforced by its director, Campbell, for more than a decade. Based on this evidence, a reasonable, conscientious jury did infer a pattern of unconstitutional misconduct so “continuing, widespread, [and] persistent” on the part of Dodge County’s employees “as to constitute a ‘custom or usage’ with the force of law.” Id. at 880. Accordingly, the evidence was clearly sufficient to support the jury’s finding Dodge County had “a policy or custom of failing to implement reasonable suicide prevention practices” — a finding which precludes the County from asserting the qualified immunity defense. The district court therefore properly denied the County’s motion for judgment as a matter of law.
III.
Because I decline to substitute this court’s judgment for that of the jury, I must respectfully dissent.

. Policy 12.4(D)(3) provides:
Either the Nurse or the on-duty Shift Supervisor may place an individual on a suicide level or upgrade that level as necessary. However, the nurse and the shift supervisor must agree to downgrade the suicide level or remove the inmate form a suicide level altogether....
(Emphasis added.)

. Policy 12.4 provides that "[i]f correctional personnel or another staff person is aware of an inmate who has made a suicide threat/gesture or if there is a reason to believe that an inmate is potentially suicidal,” the staff must notify the shift supervisor immediately. The responsibility to place the inmate on an appropriate suicide watch, fill out the form, place it in the suicide notebook, and update it on a daily basis lies with either the nurse or the shift supervisor.